Jack FARNSWORTH and John
Cunningham, Respondents,

v.

MISSOURI DEPARTMENT OF
CORRECTIONS & HUMAN
RESOURCES, Appellant,

and

Personnel Advisory Board of the State
of Missouri, Defendant.

No. WD 39384.

Missouri Court of Appeals,
Western District.

Jan. 12, 1988.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
March 1, 1988.

Application to Transfer Denied
April 19, 1988.

David C. Mason, Gen. Counsel, Missouri Dept. of Corrections & Human Resources, Jefferson City, for appellant.

John Landwehr of Cook, Vetter & Doerhoff, Jefferson City, for respondents.

Before CLARK, P.J., and TURNAGE and MANFORD, JJ.

MANFORD, Judge.

Appellant (Missouri Department of Corrections and Human Resources, hereinafter MDCHR) appeals from the judgment of the circuit court which reversed a determination of the Personnel Advisory Board (hereinafter the Board) to discipline respondents Jack Farnsworth and John Cunningham. This court affirms the Board's decision, thereby reversing the circuit court.

The action commenced as follows:

On the basis of a report filed by Mark Schreiber, Chief Internal Affairs Officer for MDCHR, the Appointing Authority suspended Farnsworth and Cunningham from their positions as Farms Director and Farms Manager II (respectively) over the Central Missouri Correctional Center (CMCC) farming operation. The suspensions were with pay pending further investigation.

Following said investigation, David Korman, Director of the Division of Administration, placed Farnsworth and Cunningham on leave without pay pending an Administrative Review Committee (ARC) hearing. Both Farnsworth and Cunningham were thereafter permitted to appear at the ARC hearing where they were given an opportunity to respond to the allegations against them. Based on the hearing, the ARC did not recommend disciplinary action against Cunningham, but did recommend disciplinary action short of termination against Farnsworth.

Thereafter, Korman and Dr. Lee Roy Black, then Director of MDCHR, reviewed the allegations and evidence against Farnsworth and Cunningham, and arrived at the conclusion that discipline greater than that recommended by the ARC was necessary. Black thereafter ordered the termination of

Farnsworth and a ten-day suspension of Cunningham.

Farnsworth and Cunningham appealed to the Board. Following a hearing before a hearing officer, the Board determined that there was substantial and competent evidence to affirm the decision of the MDCHR and thereby ordered the termination of Farnsworth and the ten-day suspension of Cunningham. Farnsworth and Cunningham filed their petition for review of the Board's decision before the Circuit Court of Cole County. That court issued its opinion reversing the Board's decision. MDCHR filed its notice of appeal with this court.

This court's review of the Board's findings of fact is limited to determining whether the decision is supported by competent and substantial evidence upon the whole record and, even if the evidence would warrant either of two opposed findings, this court must uphold the factual determination of the Board. Section 536.140.2, RSMo 1986, and *Osage Outdoor Advertising, Inc. v. State Highway Commission of Missouri*, 687 S.W.2d 566, 568 (Mo. App.1984). Where evidentiary support for such findings is challenged, as herein, this court must review the evidence in the light most favorable to the Board's decision, deferring to the Board on matters of weight to be given conflicting evidence. *Ballew v. Ainsworth*, 670 S.W.2d 94, 102 (Mo.App. 1984).

The evidence, when viewed as such, may be summarized as follows:

MDCHR ran several agricultural operations which were staffed with inmate labor. The purpose of these operations was to provide inmates with employment experience (the inmates received a small salary) and to provide produce, meats, and dairy products for the prison cafeterias.

At the time of his termination, Farnsworth was employed as the Farms Director for MDCHR. The position of Farms Director is described as follows:

This is administrative farm management in the planning and coordination of an institutional farm program for the Department of Corrections and Human Resources.

An employee in this class is responsible for the management of all institutional farm operations in the adult Correctional facilities. Work involves responsibility for planning long-range, diversified farming and dairy operations. Work includes providing technical advice and assistance to Farm Managers and includes the establishment and interpretation of program policy, and the development of operating procedures for farm operation. The employee has final responsibility for all purchases of raw materials and equipment and determines which products are to be produced and that appropriate procedures are followed. Supervision is exercised over Farm Managers and Farm Supervisors who are responsible for Corrections farm or dairy operations. Work is performed with considerable latitude for independent action and exercise of initiative, subject only to general supervision from an administrative superior.

Likewise, at the time of his suspension, Cunningham was employed as Farm Manager II for MDCHR, which is described as follows:

This is administrative and management work in the operation and maintenance of a large multiple operation institutional farm.

An employee in this class is responsible for the successful management of a large scale dairy herd and farming operation. Work includes developing short and long term plans for dairy and farm operations. Supervision is exercised over all farm workers through subordinate Farm Manager Is [ones] and Farm Supervisors. Work is performed under the supervision of an administrative superior who makes work assignments and reviews work for conformance with established institutional or departmental policy and for attainment of goals and objectives; however, the employee is expected to exercise a high degree of initiative and judgment in the farm management.

In February of 1985, Mark Schreiber was sent to the CMCC farm operation (also referred to as Church Farm) to investigate

allegations concerning inmate use of fire-arms at the farm. On February 24, 1985, Schreiber filed his report, which detailed deplorable unsanitary conditions at the dairy operation of the farm. Schreiber's report noted that "[n]umerous individuals consisting of both employees and inmate workers have been interviewed", and that based upon these interviews and his own observations, Schreiber noted the following "allegations and accusations":

1. No one seems to have the authority to make decisions at the dairy and farm operation.

2. When decisions are made, they are often overruled or reversed by either Mr. J.L. Cunningham or by Mr. Jack Farnsworth.

3. Records are not properly kept and in many instances are not maintained at all.

4. The dairy operation is not properly managed and maintained and as a result milk production is inferior and unsafe and does not meet even minimum standards required. This includes the allegation that diseased cows are being milked.

5. Cattle are often mistreated and not properly cared for.

6. Supplies are ordered and are not received or are not used once they are received.

7. Inmates assigned to the farm operation are often unsupervised for long periods of time. During these unsupervised periods they hunt with firearms, are met by women and engage in various other activities.

8. Extensive death losses of cattle and particularly calves are common place.

9. Inhumane treatment of cattle.

10. That the farm crew is not allowed to use branding equipment for I.D. of cattle and that photographs are not being taken of cattle for registration purposes.

\* \* \* \* \* \*

1. That cattle and calves are being stolen.

2. That thefts of cattle are being covered up in records.

3. That dead cattle and calves are being retagged and counted twice to indicate two deaths thus allowing the theft of a live calf.

4. That I.D. tags and photographs don't match the cows or calves.

5. That registration records are not accurate and possibly have been falsified.

6. That at the direction of supervisory staff, inmate clerks have made false record entries to coverup (sic) losses or shortages in grain supplement and other items.

7. That diseased cattle are being milked.

8. That milk has had water added to it to make up for poor production.

9. That various supplies, equipment and materials are not being received and are possibly being stolen from the operation. Some items specifically mentioned were[:]

a. Steel fence posts.

b. Metal or steel fence sections.

c. Barbed wire.

d. Medicine.

e. Tools.

f. Plastic water pipe.

10. That Missouri Conservation statutes have been violated on numerous occasions by both inmates and staff with the knowledge of supervisory staff.

11. That supervisory staff at the farm have allowed inmates to be in possession of firearms even though such practices would constitute a serious violation of Missouri Criminal Statutes.

12. Allegation that various items of machinery, equipment and parts have been stolen from the bottom farm operation, and that these shortages or thefts have been covered up.

Schreiber concluded that, due to the severity of these allegations, further investigation was warranted by a special investigative team, including a professional auditor and Missouri State Highway Patrol personnel experienced in the investigation of fraud operations and government scandal.

Schreiber's report also referred to a report filed by him on February 20, 1985, which gave extensive and detailed descriptions of the unsanitary conditions at the dairy such as "interior of the dairy barn was filthy and the floor consisted of several inches of manure, urine and other waste which had been allowed to accumulate"; "area designated as a milking parlor was filthy"; "area located on the exterior of the barn on the west side, consisted of a large pool of waste through which animals had to wade"; "remains of 3 calves were observed immediately behind the dairy barn"; "large open pit was observed several hundred wards (sic) due west of the dairy barn. Approximately 25 to 30 dead cows and calves were observed in this pit"; "[a]pproximately ¼ mile from [Highway 179] in a field, numerous remains in various stages of decomposition were found, mostly consisting of young calves ... In all, approximately 15 to 20 such remains were found in and along this field." Schreiber took approximately 54 photographs of the conditions he observed that day.

Pursuant to Schreiber's suggestions, the State Auditor was asked to come to the CMCC farm and perform a management and financial audit of the operation. The auditor's report was released on August 5, 1985. The report states that the auditor:

reviewed the dairy's and farm's financial statements, purchasing procedures and documents, expenditures, inventory controls and records, operations reports, and other pertinent procedures and documents; interviewed dairy and farm personnel and met with representatives of the University of Missouri, Animal Science Department and Missouri State Highway Patrol; and compiled the information in the appendices from the records and reports of the Department of Corrections and Human Resources.

The report noted: "a number of serious deficiencies in the management of the Church Farm and Dairy. Two items in particular contributed to the overall management deficiency: a lack of adequate reporting to upper level management and a lack of formal policies and procedures."

The auditor's report outlined numerous problems including: deficiencies in feed controls and inventory records wherein unexplained discrepancies existed between the resultant ending inventory and the reported ending inventory, and wherein adjustments to inventory records were made with no supporting documentation; excessive seed and chemical inventory wherein some portions had been on hand for nearly three years while additional supplies were being ordered; security problems, including possible stolen livestock, equipment and supplies, and unrestricted access to the premises by outside persons; livestock control problems, including inadequate branding and registration of cattle, inadequate procedures for the reporting of deaths and births of cattle; inadequate control over handtools, resulting in numerous items unaccounted for; excessive repair costs for farm vehicles and equipment and a lack of a preventative maintenance program; problems with the handling of milk purchases from other dairies thereby overstating dairy production, risking exposure to unsanitary conditions, overcharging the prisons, and resulting in excessive cost to rebag the milk; problems with milk processing, including milking without filters or clarifier, adding water to milk, milking when pasteurization controller/recorder is not functioning; failure to have the dairy inspected by the State Milk Board or the Division of Health; and failure to plan for increase in the size of the herd, resulting in overcrowding and deplorable unsanitary conditions.

The MDCHR also requested that the University of Missouri–Columbia Department of Dairy Science inspect the dairy operation and file a report and recommendation. Such a report was filed on June 10, 1985. The report cited numerous problems in the areas of management, supervision, overcrowding, feed inventory, training of inmate labor, sanitation and waste disposal, animal disposal, calving and raising calves, death verification, management of sick cows, and milking procedures and equipment.

These reports, as well as numerous other exhibits, were admitted into evidence at the Board hearing. Most of the documents went in unchallenged. In addition, expert witnesses testified on behalf of appellant. Randel Hilger testified that he was a senior auditor in the State Auditor's Office and that he was in charge of the special review of the Church Farm and the principal author of the auditor's report. Hilger testified as to several personal observations made by him and other auditors. Hilger also testified as to the procedures he followed in conducting the special review.

Barry Steevens testified that he was a state extension dairy specialist with the University of Missouri, Dairy Science Department, in Columbia, Missouri. Steevens testified as to diseases in cattle generally; i.e., prevention, detection, cause and effect, contagion, and treatment. He specifically stated that it is desirable to separate diseased cows from healthy ones. Steevens was familiar with the Church Farm dairy operation and testified that there existed a means to effectively and efficiently separate the diseased cows from the healthy ones. He also testified that the grooving of the alleys in the free-stall barn would decrease the risk that cows would slip and fall while walking on the frozen urine and manure which had accumulated in this area. Steevens stated that grooving was practical and possible.

Respondents' evidence consisted of testimony from respondents, CMCC employees, and employees of various state agencies. All testified that Farnsworth and Cunningham did a good job in managing the farm and that the cause of virtually all of the problems cited in the reports was the transfer of the entire dairy herd of Fulton State Hospital to the Church Farm facility. This transfer, according to respondents, was accomplished despite their protests and resulted in the spread of disease, overcrowding (also attributing to the build-up of waste materials) and lack of control over milking procedures. Appellant admitted that the transfer of stock from Fulton created the potential for these problems, but argued that the cause of these problems was the failure of Farnsworth and Cun-

ningham to adequately plan and implement procedures to accommodate the additional cattle.

Following the hearing, the Board issued Findings of Fact and Conclusions of Law wherein the Board found the following:

9. With respect to Appellant Farnsworth, the Board finds that under his supervision there was a general lack of communication between management and staff. There was an absence of formal policy to ensure farm direction to the staff. Inventory records were inadequate and this led in some cases to overstocking of inventory and lack of accountability for equipment and supplies. The evidence does not establish clearly what the financial loss entailed. The Appellant Farnsworth's failure to make meaningful management decision and failure to inspect properly contributed to loss in the farm operations.

10. After closely considering the evidence and demeanor of the witnesses, the Board finds that the Appellant, Jack Farnsworth, was inadequate, careless or inefficient in the performance of his duties.

11. With respect to Appellant Cunningham, the Board finds that Appellant Cunningham, as well as Appellant Farnsworth, was well-educated and highly skillful in the field of farm operations. Nonetheless, Appellant Cunningham failed to develop and implement adequate policies and procedures at CMCC. Appellant Cunningham failed to plan adequately and to supervise subordinates in livestock management. Appellant Cunningham failed to ensure that subordinate staff maintained dairy equipment adequately. Appellant Cunningham failed to supervise subordinates to ensure proper sanitation of livestock areas. Appellant Cunningham failed to supervise employees and inmates effectively to prevent illness and injury to the dairy herd. Appellant Cunningham failed to ensure proper control of inventory records and equipment accountability.

12. After closely considering the evidence and the demeanor of the witness-

es, the Board finds that Appellant, John Cunningham, was inadequate, careless or inefficient in the performance of his duties.

The Board concluded that the dismissal of Farnsworth and the suspension of Cunningham were for good cause, thereby affirming the actions taken by the MDCHR. Respondents then filed their petition for review of the Board's decision. In its Findings of Fact and Conclusions of law, the circuit court held:

10. Based on the foregoing, it is found that the evidence presented by Corrections does not rise to the level of being competent and substantial evidence in support of the disciplinary action.

11. Further, it is found that, in light of evidence adduced by plaintiffs, the decision of the Personnel Advisory Board is contrary to the overwhelming weight of competent evidence....

The court reversed the Board's decision and ordered the reinstatement of Farnsworth and Cunningham to their former positions, with back pay. Appellant timely filed its notice of appeal.

Although MDCHR is the appellant and Farnsworth and Cunningham respondents (by virtue of the circuit court judgment), respondents, correctly so, are challenging the determination of the Board. Therefore, in its disposition of this appeal, this court characterizes respondents' argument as points on appeal. When viewed as such, respondents' points may be summarized as follows: (1) The Board's decision was not supported by substantial and competent evidence upon the whole record; and (2) the Board's decision was clearly contrary to the overwhelming weight of the evidence.

As stated *supra,* this court's review of the Board's decision is limited. To affirm the decision of the Board, this court need only find that there is competent and substantial evidence upon the whole record to support the Board's determination.

Although hearsay evidence is admissible in an administrative proceeding, it does not qualify as competent and substantial evidence upon the whole record to support the findings of fact by an administrative agen-

cy. *Mark Twain Homes, Inc. v. Labor & Industrial Relations Commission,* 616 S.W.2d 145, 147 (Mo.App.1981). Respondents argue that when the hearsay evidence is eliminated from consideration, there remains no competent and substantial evidence upon the whole record to support the Board's decision.

■ Respondents first cite to the Schreiber reports as being hearsay and therefore not competent and substantial. The Schreiber report, dated February 20, 1985, states that it is a compilation of "observations and interviews". Much of the report is recitation of personal observations by Schreiber, who testified, during the hearing, of the conditions that existed at the farm on the day of his visit. Such evidence is not hearsay and is competent.

■ The remainder of Schreiber's February 20th report is a recitation of statements made to him during interviews of farm employees and inmates. While at first glance this evidence appears to be hearsay, in reality it is not. A statement by a witness regarding the statement of another is subject to the hearsay rule only when offered to prove the truth of the fact asserted. *Giessow v. Litz,* 558 S.W.2d 742, 750 (Mo.App.1977). The report notes in several places that the allegations made by inmates and employees reflect only the declarant's opinions and are not proven to be fact. The statements contained in the report are evidence of the fact that *allegations* and *complaints* were made, not to prove the truth of those allegations.

■ Likewise, the Schreiber report dated February 24, 1985, contains recitation of personal observations as well as statements by farm employees and inmates. Again, these statements are not offered to prove the truth of the fact asserted. The February 24th report is regarding "Recommendation for Additional Investigation CMCC Farm Operation". The statements of the employees and inmates are not subject to the hearsay rule and are admissible because they establish the basis of Schreiber's recommendation that there be further investigation. *See Martin v. Barbour,* 558

S.W.2d 200, 212 (Mo.App.1977). Therefore, both Schreiber reports were competent evidence to be considered by the Board.

Next, respondents attack the competency of the State Auditor's Special Review. Hilger testified that as a senior auditor of the State Auditor's Office, he was in charge of conducting the Special Review and that he was the principal author of the report. The report states that the objectives of the review were:

1. Study and evaluate the system of internal controls at the dairy pertaining to the purchase and accountability for livestock, feed and supplement, machinery, equipment, and supplies.

2. Study and evaluate the system of internal controls at the farm pertaining to seed, fertilizer, machinery, and equipment.

3. Perform a limited review of certain management practices to determine the efficiency and effectiveness of those practices.

4. Evaluate the long-term potential for the Church Farm dairy and farming operations, as it relates to staffing, facilities, potential for efficient and economical operation, and cost justification.

It states that the review was performed "in conjunction with representatives of the University of Missouri, Animal Science Department and the Missouri State Highway Patrol". The report further states:

Our review was made in accordance with generally accepted government auditing standards and included such procedures as we considered necessary in the circumstances. In this regard, we reviewed the dairy's and farm's financial statements, purchasing procedures and documents, expenditures, inventory controls and records, operations reports, and other pertinent procedures and documents; interviewed dairy and farm personnel and met with representatives of the University of Missouri, Animal Science Department and Missouri State Highway Patrol; and compiled the information in the appendices from the records and reports of the Department of Corrections and Human Resources. Be-

cause the data presented in the appendices were provided by the department and were not verified by us via additional audit procedures, we express no opinion on them.

Section 536.070, which prescribes the foundation necessary to admit evidence in an administrative procedure states:

(11) The results of statistical examinations or studies, or of audits, compilations of figures, or surveys, involving interviews with many persons, or examination of many records, or of long or complicated accounts, or of a large number of figures, or involving the ascertainment of many related facts, shall be admissible as evidence of such results, if it shall appear that such examination, study, audit, compilation of figures, or survey was made by or under the supervision of a witness, who is present at the hearing, who *testifies to the accuracy of such results*, and who is subject to cross-examination, and if it shall further appear by evidence adduced that the witness making or under whose supervision such examination, study, audit, compilation of figures, or survey was made was basically qualified to make it. All the circumstances relating to the making of such an examination, study, audit, compilation of figures or survey, including the nature and extent of the qualifications of the maker, may be shown to affect the weight of such evidence but such showing shall not affect its admissibility. (Emphasis added.)

Respondents argue that because Hilger did not testify to the accuracy of the results of the report, then the report is not admissible as competent evidence under § 536.070(11).

 Respondents are correct and the report itself is not competent evidence. However, Hilger testified at great length as to the contents of and conclusions in the report, and when asked to render an opinion as to whether the Church Farm dairy operation was properly managed, Hilger responded, over objection:

A. There were several areas that I thought indicated a lack of—a lot of poli-

cies and written procedures that we looked at indicated that management was aware of certain problems there; however, the directives that were given did not indicate that the solutions to those problems as presented in the policies and procedures had ever been carried out. Respondents' objection and argument that Hilger was not qualified to render such an opinion because he lacks agricultural expertise merely goes to the weight the testimony is to be given. *See* § 536.070(11).

Furthermore, respondents' argument that Hilger's opinion is not competent because the auditor's office does not have the authority to judge the performance of any department has no merit. The authority cited by respondents, *Director of Revenue v. State Auditor,* 511 S.W.2d 779 (Mo.1974) is not on point. Further, respondents' reliance upon and their citation to a Missouri Attorney General's opinion is not persuasive. Such opinions have no legal or precedential value before this court.

■ Respondents also attack the competence of several other documentary exhibits, however, this court need not address those arguments because even excluding those documents, there was substantial and competent evidence to support the Board's decision. Substantial evidence has been defined to mean "competent evidence which, if believed, would have probative force on the issues". *Midstate Oil Company, Inc. v. Missouri Commission on Human Rights,* 679 S.W.2d 842, 846 (Mo. banc 1984), citing *Barnes Hospital v. Missouri Commission on Human Rights,* 661 S.W.2d 534, 537 (Mo. banc 1983). This court holds that there was competent evidence (i.e., Schreiber's reports, testimony, and photographs, Hilger's testimony, Steevens' testimony; together with numerous other exhibits which are unchallenged), which, if believed, would have probative force on the issue of respondents' failure to properly perform their duties.

Respondents' second point urges this court to reverse the decision of the Board because said decision is clearly contrary to the overwhelming weight of the evidence. In its Findings of Fact and Conclusions of Law, the circuit court held that "in light of the evidence adduced by plaintiffs, the decision of the Personnel Advisory Board is contrary to the overwhelming weight of competent evidence."

The foregoing statement clearly indicates that the trial court's standard of review was improper. Although a court must determine whether an administrative board's findings are contrary to the overwhelming weight of the evidence, in examining such evidence, the court must consider only competent evidence, and must view that evidence in a light most favorable to the board's decision, together with all reasonable inferences which tend to support it. *Board of Education, Mt. Vernon Schools, Mt. Vernon v. Shank,* 542 S.W.2d 779, 782 (Mo. banc 1976).

In reviewing the evidence, the circuit court held the Schreiber reports and testimony to be not competent because the reports "consist almost entirely of secondary information from other persons", and Schreiber's testimony "merely accumulated statements and opinions from other persons". As discussed *supra,* the Schreiber reports and testimony are competent. The court also discounted the Schreiber photographs because "Schreiber had no knowledge as to the causes of these conditions". The court clearly misunderstood the evidentiary significance of the photographs.

Further, the court discounted the Hilger testimony because "on cross examination, significant deficiencies in the 'special review' were brought to light". The method by which an expert reaches his conclusion goes only to the weight to be given the evidence, and does not affect its admissibility. *Sparks v. Consolidated Aluminum Co.,* 679 S.W.2d 348, 351–52 (Mo.App.1984). The weight to be given a piece of evidence is to be determined by the Board, and this court must defer to the Board on this matter. *See Board of Education, Mt. Vernon Schools, Mt. Vernon v. Shank,* 542 S.W.2d at 782.

A reading of the circuit court's opinion clearly indicates that that court considered the evidence in the light most favorable to respondents, and virtually ignored or dis-

counted all competent evidence in favor of the Board's decision. A court cannot reverse the decision of an administrative board simply because the evidence could support another finding; and a court may not substitute its own judgment on the evidence in place of that of the board. *Id.*

This court holds that the findings of the Board are not against the overwhelming weight of the evidence, and the Board's decision is supported by substantial and competent evidence. This court affirms the decision of the Board, thereby reversing the circuit court and remanding the cause with directions that the circuit court enter its order affirming the Board's decision.

All concur.