**STATE of Missouri ex rel. John C. DANFORTH, Attorney General, Plaintiff-Respondent,**

v.

**INDEPENDENCE DODGE, INC., a corporation, Defendant-Appellant.**

**No. KCD26024.**

Missouri Court of Appeals, Kansas City District.

April 2, 1973.

Motion for Rehearing and/or Transfer Denied May 7, 1973.

Cedric Siegfried, Independence, for defendant-appellant.

John C. Danforth, Atty. Gen., Jefferson City, Harold L. Lowenstein, Asst. Atty. Gen., Kansas City, for plaintiff-respondent.

Before DIXON, P. J., and SWOFFORD and WASSERSTROM, JJ.

WASSERSTROM, Judge.

The attorney general instituted this proceeding to enjoin defendant from acts alleged to be unlawful under the Merchandising Practices Act, Chap. 407, R.S.Mo., 1969, V.A.M.S. The trial court granted an injunction from which defendant now appeals. This appears to be the first case to reach any appellate court under this new statute, and therefore the questions here are of first impression.

The appeal presents four points upon which defendant seeks a reversal. The first assignment is that the court below had no jurisdiction because the attorney general did not make a Civil Investigation Demand. The second assignment challenges the Findings of Fact and the third assignment challenges the Conclusions of Law made by the trial court; these two assignments will be considered together. The final assignment of error is that the injunction relief granted was improper and unconstitutional.

I

Defendant's procedural argument is based upon its construction of § 407.100, and the interrelationship of that section with §§ 407.040 and 407.050. The first of those sections grants authority for the filing of this type of proceeding and provides:

"Whenever it appears to the attorney general that a person has engaged in or is engaging in any practice declared to be unlawful by sections 407.010 to 407.130 he may, after notice to such person, if such notice can be given in the manner provided in section 407.040, seek and obtain in an action in a circuit court an injunction prohibiting such person from continuing such practices or engaging therein or doing any acts in furtherance thereof. Such notice shall state generally the relief sought and be served in accordance with section 407.050 at least three days prior to the institution of such action."

Under those provisions it is mandatory that a three-day notice be given to the proposed defendant before court action is actually commenced. The manner in which that notice is to be given is specified by reference to the provisions in § 407.040 relating to "Civil Investigative Demands". Although the notice required by § 407.100 is different from the Civil Investigative Demand authorized by § 407.040, the method of service is thus made identical for both.[1]

---

1. It will be noted that § 407.100 also contains a provision that the three day notice be served "in accordance with the provisions of § 407.050". This reference to § 407.050 is obviously an inadvertent error, since § 407.050 contains no provision whatever relating to service. We conclude that this reference was a clerical mistake and that the legislative intention was to make reference to the manner of service set forth in § 407.040, subparagraph 4. The legislative history

The attorney general here did give a three-day notice prior to filing suit, but he did not attempt to pursue any Civil Investigative Demand. Defendant contends the latter failure deprived the Circuit Court of any power to proceed. It argues that the legislature intended by referring in § 407.-100 to the provisions of § 407.040, to require a Civil Investigative Demand under the latter section as a jurisdictional prerequisite to the filing of an injunction suit. We cannot agree. § 407.100 makes no such express requirement, and there is no reason to import such a requirement by implication.

■ The purpose of the Civil Investigative Demand procedure is to provide a form of pretrial discovery for the benefit of the attorney general. A comparison of the provisions of § 407.040, which creates this new procedure, with the Federal Antitrust Civil Process Act, 15 U.S.C.A. § 1312, reveals that our new Civil Investigative Demand proceeding is patterned after the parallel provisions of the Federal procedure which is also entitled "Civil Investigative Demand". The new procedure under § 407.040 is also similar to the pretrial discovery opportunities given to the Missouri Attorney General in antitrust cases under § 416.300, R.S.Mo.1969, V.A.M.S.

Under neither of those older Federal or Missouri provisions has it ever been intimated that the pretrial discovery had to be pursued as a necessary prerequisite to the filing of suit for coercive relief. On the contrary, it has always been considered that these provisions were intended for the benefit of the attorney general if he chose to use them, but that he is under no compulsion to do so. See Annotation "Validity, Construction, and Application of Antitrust Civil Process Act", 10 A.L.R.Fed. 677. The same must be true of the procedure afforded to the attorney general under § 407.040. This

section provides him with another tool in his litigative kit, similar to the various discovery methods traditionally available after suit is filed. The pretrial discovery can be used or not at the option of the State, and non-use by the State cannot give rise to any legitimate complaint by the defendant.

■ Defendant argues, however, that the construction sought by it is necessary so that a prospective defendant may have an opportunity to know that litigation is contemplated and to present to the attorney general his version of the dispute before adverse and possibly unjustified publicity has been incurred. The legislature has made provision to cover this contingency, without the necessity of the forced construction urged by the defendant. The whole purpose of § 407.100 is to provide three-day notice to a prospective defendant before the suit is filed, and during this three-day period he does have the opportunity to approach the attorney general and negotiate for either a dropping of the proceeding or the substitution of an assurance of voluntary compliance in accordance with the terms of § 407.030. Thus every prospective injunction defendant will have the opportunity for private discussion with the attorney general, without any necessity of a Civil Investigative Demand.

■ Moreover, defendant's argument proceeds on the assumption that a Civil Investigative Demand affords some sort of an opportunity for administrative hearing. Not so. § 407.040 does not require the attorney general to hold a hearing of any kind, it affords no opportunity for the defendant to appear and be heard, and it provides for no formal findings by the attorney general as a result of his investigation. As already stated, the Civil Investigative Demand procedure is entirely unilateral, and is intended solely for the benefit of the

supports this conclusion and shows that the error crept into the Senate Committee Substitute for House Committee Substitute for House Bill No. 19. In that Senate Committee Substitute, there appeared two erroneous references to "section 5 [now

§ 407.050 R.S.Mo.1969] of this act." The truly agreed version corrected the first of these two errors but the second reference was not corrected, apparently by oversight.

attorney general, not for the benefit of the defendant.

 There flickers fitfully in defendant's argumentation two further fleeting contentions: (1) that the three-day notice was not sufficiently specific, and (2) that the manner of service of that notice did not comply with any of the four methods authorized by paragraph 4 of § 407.040. These contentions will not be considered because neither is specified in defendant's Points Relied On, as required by Rule 84.04(d), V.A.M.R. Furthermore, and more fundamentally, each of those complaints was waived by defendant's filing of answer without making either of those objections.[2] This disposition of these points should not, however, be taken as an approval of the State's singularly uninformative three-day notice, which purports to state the charge against defendant and the relief sought by merely repeating the words of the statute; nor should this ruling be construed as approving the manner in which that notice purported to be served, by mailing it to defendant's registered statutory agent in St. Louis, whereas defendant's place of business was in Independence, Missouri.

## II

Defendant's second and third assignments of error attack the trial court's Findings of Fact and Conclusions of Law to the effect that defendant committed unlawful merchandising practices in violation of § 407.-020.[3] Those findings and conclusions relate to three separate sale transactions and also to an alleged general practice by defendant of turning back odometers.

Defendant's brief contains a detailed analysis and attack upon virtually every one of the findings and conclusions made by the trial court. It is neither necessary nor in order for us to pursue this approach. The precise correctness of those findings and conclusions are of relatively minor importance, since under Rule 73.01(d), this Court makes its own findings and reaches its own conclusions, giving due regard to the opportunity of the trial court to judge the credibility of witnesses. In keeping with that scope of review, we now turn to the evidence as to each of the violations alleged.

A. *The Cox transaction.* The first transaction as to which defendant is charged with fraudulent practices was the purchase by Mr. David E. Cox of a Dodge automobile in August, 1969. He called at the defendant's place of business in response to a newspaper advertisement and was shown a 1969 Monaco Dodge which, according to Cox, was represented to him as having been driven only by defendant's general manager, and as being a new car in every respect except that it had been driven a little over 3,000 miles. In reliance upon those assurances, Cox stated he bought the automobile. He immediately had difficulty. The car shimmied, got hot and the radiator boiled over; the air-conditioner did not work well; the driver's door did not close right; the speedometer would not operate; and the transmission leaked fluid out of both the front and rear seals. Cox then took in the car for repair. He also consulted an attorney who made demand upon defendant for indemnification.

Defendant then caused the car to be inspected by a Chrysler representative, and the inspection showed defects in the automobile which had apparently been caused by the car having been in a wreck. Visual in-

---

2. The defendant raised these objections for the first time (and even then in only oblique, unsatisfactory fashion) by motion to dismiss the petition, filed August 16, 1971. This motion was almost exactly eight months after defendant had already filed its answer.

3. " § 407.020. Unlawful practices, exceptions

"The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise, is declared to be an unlawful practice * * *"

spection of the underside of the car showed the following written on the muffler and exhaust pipe: " '69 Dodge Monaco, 9–50, do not sell".

Contrary to the statements Cox testified were made to him by the defendant's salesmen, the actual facts were that defendant's used car manager Schweer had purchased this Monaco Dodge from a used car dealer Evans at an automobile auction the day before it was sold to Cox, after Evans had been unable to get a bid at the auction. Evans testified that Schweer's inspection of the car disclosed to him that it had been in a wreck, and in response to Schweer's inquiries Evans told him the nature of the repairs. He also told Schweer that this car had previously been leased to Avis Rental Company.

■■■ Many of the facts detailed above were denied by defendant's witnesses. However, the trial court chose to believe Cox and Evans, and we defer to those findings, in light of the trial court's opportunity to personally observe the contradictory witnesses. Under the testimony accepted by the trial court, defendant's conduct falls within the prohibition of § 407.020. Statutes of this type for the protection of consumers have been adopted by at least 36 states. Lovett "State Deceptive Trade Practice Legislation", 46 Tul.L.Rev. 724. The purpose of these statutes is to supplement the definitions of common law fraud in an attempt to preserve fundamental honesty, fair play and right dealings in public transactions. In order to give broad scope to the statutory protection and to prevent ease of evasion because of overly meticulous definitions, many of these laws such as the Missouri statute "do not attempt to define deceptive practices or fraud, but merely declare unfair or deceptive acts or practices unlawful . . . " Commerce Clearing House, Poverty Law Rep., Vol. 1, ¶ 3200, leaving it to the court in each particular instance to declare whether fair dealing has been violated.

■■■ However, even were we to be confined to the established common law principles, the acts committed in the Cox transaction would qualify as fraud and deceit. Under credible evidence which the trial court was entitled to believe, defendant's manager Schweer was fully aware when he purchased the Monaco Dodge in question that it had been in a serious wreck and Evans had told him directly the nature and extent of the repairs which had been made. If there were no more involved here than mere silence, the failure of defendant to disclose these facts in face of knowledge of their existence could be held to be fraudulent. Miller v. Higgins, 452 S.W.2d 121 (Mo.1970); Ackmann v. Keeney-Toelle Real Estate Co., 401 S.W.2d 483 (Mo. banc 1966). But here, mere silence does not stand alone. In addition, defendant's salesmen Veatch and Scott affirmatively represented, according to evidence accepted by the trial court, that the car being sold to the Coxes had been driven only by the defendant's general manager and that the Monaco Dodge "was a new car in every respect" except that it had been driven for approximately 3,000 miles. Even if Veatch and Scott did not have the specific knowledge which had been gained by Schweer, nevertheless Veatch and Scott were guilty of fraudulent conduct in making affirmative statements while conscious that they were actually without knowledge as to the truth or falsity of the statements so made. Ackmann v. Keeney-Toelle Real Estate Co., supra.

■■■ B. *The LaHue Transaction.* In August, 1970, Mrs. Mary Edith LaHue came to defendant's place of business, looking for a dependable car. Akins, one of defendant's salesmen, showed her a 1970 Coronet Dodge. Mrs. LaHue testified that Akin represented to her that the car was "a demonstrator" and that it was "just as good as new". Relying on those representations Mrs. LaHue purchased the automobile, receiving a promise that defendant would supply an undercoat.

After the car was delivered, Mrs. LaHue began to have trouble. The seat belt stuck, the trunk did not close, the molding was broken on the back window, there was noise in the steering column, and the speedometer light and radio did not work. The car "wouldn't track" and when she got to freeway speeds it shook and shimmied. She complained to defendant and some of the minor items were corrected, but even after the attempt at repair the car still shimmied, it didn't track right, the accelerator stuck and the air-conditioning and fan did not work right.

After the attorney general gave notice to defendant of the proposed injunction suit to be brought by the State, defendant's sales manager Phillips called Mrs. LaHue to advise her that the undercoating had never been done and that she should bring the car in for that purpose.

The salesman Akins, who no longer worked for defendant at the time of trial, testified for the State. He testified that the automobile sold to Mrs. LaHue had previously been used by him as a demonstrator when he first came to work for defendant, but that it performed so badly that he could not use it and insisted that he be given a different demonstrator. After the car had been sold, the sales manager Phillips, according to Akins, told him to have Mrs. LaHue bring the car in for an inspection. Akins' testimony was that Phillips told him at that time that "the car had been wrecked and he didn't want anything to happen to the deal". Also after the sale Akins says he mentioned to Phillips that the car had been sold with a promise of undercoating and that no undercoating had been done, to which Phillips responded that Akins should "let it go" because "she would probably never know the difference anyway".

The testimony by Akins was contradicted by defendant's employees Phillips, Fett and Bindi. Here again, the trial court was faced with a square contradiction between opposing witnesses and it was peculiarly within his province to resolve the question

of credibility. We defer to his judgment with respect to this conflicting evidence, which he resolved against the defendant.

■ On this testimony accepted by the trial court, defendant was plainly guilty of deception and fraud in the LaHue transaction. The car was obviously other than a mere demonstrator, as represented, since it had been in a wreck so serious that Akins could not drive it and had to be given a replacement. See Beshears v. S–H–S Motor Sales Corp., 433 S.W.2d 66 (Mo.App.1968). Moreover, the silence by defendant's employees in the face of knowledge of the fact of the wreck constitutes fraud. Miller v. Higgins; Ackmann v. Keeney-Toelle Real Estate Co., supra. In addition, the purposeful and intentional failure to perform the undercoating on this car on the assumption that Mrs. LaHue "would probably never know the difference" is fraud of an aggravated character.

■ C. *The Phelps Transaction.* On August, 1970 Mr. Richard Phelps came to defendant's place of business asking for a car having low mileage with some factory warranty still remaining. He noticed at that time a big billboard behind defendant's lot advertising "Chrysler 50,000 miles or five year warranty on all drive-train components". Defendant's salesman showed him a Coronet Dodge on which the odometer showed a mileage of 31,000 miles and in response to Phelps' inquiry, assured him as to the correctness of that reading. Relying upon that assurance, Phelps bought the car.

At the time the car was sold, it had purportedly been previously inspected and approved on August 12, 1970. About a month after the purchase, Phelps took the car into a service station for another inspection, and at that time the car did not pass reinspection because of excessive steering play and a defective idler arm. Other problems that Phelps had with this car were terrible overheating, water leaks inside the car, the driver's door window would not roll up, the tail light lens filled with water, on a hard

stop the car pulled to one side, and the lock on the rear door was broken. According to Phelps the car was unsafe to drive. He attempted to obtain from defendant the name of the previous owner but was unable to secure this information.

That former owner was, however, called as a witness for the State. He testified that he had driven this car from 1968 until 1970 and that at the time he traded it to defendant the mileage was around 50,000 miles. This testimony by the former owner Stewart stands uncontradicted, and leaves the inescapable inference that the odometer had been turned back very substantially in the interim between defendant's purchase from Stewart and the resale by defendant to Phelps. This practice has been previously held by the courts of this State to constitute fraud. Williams v. Miller Pontiac Co., 409 S.W.2d 275 (Mo.App.1966); Jones v. West Side Buick Auto. Co., 231 Mo.App. 187, 93 S.W.2d 1083 (1936).

▇ D. *General Odometer Tampering.* Defendant's former salesman Akins testified that there was a man who came around to the defendant's place of business "that would do the 'speedo' work, turn the speedometers back". He described this man as heavy set and usually wearing khakis. Akins further testified that after his use of the Coronet eventually sold to Mrs. LaHue, he was given a 1970 blue Charger as a demonstrator. This latter automobile had between 11,000 and 12,000 miles on the odometer. One day in mid-morning the car manager Fett asked Akins for the keys to this Charger "to remove some mileage from my car". Akins says that when he went to get his car after lunch, the car had approximately 3,000 miles on it.

This testimony by Akins was contradicted by Fett, Phelps and Schillereff. Here again, it was within the special province of the trial court to resolve the conflict in evidence and we defer to his resolution against the defendant.

## III

▇ Defendant objects to the issuance of an injunction against it on the ground that there was no showing of a lack of adequate legal remedy or that irreparable injury was threatened. The basic fallacy in this argument is that it approaches the situation as if this were merely an ordinary suit between private litigants. That is not the situation. This new public right of action was created for the very reason that private causes of action had proved largely ineffective to prevent consumer fraud. In actual practice, experience had shown that individual action by consumers is much too costly in that the expense of litigation usually outweighs the amount of likely recovery. Furthermore, the onerous provisions of adhesion contracts make recovery in this type of case difficult, while at the same time the growing impersonal character of the market place has made retail relationships less amenable to the traditional disciplines of consumer good will and the amenities of mutual acquaintanceship. Lovett "State Deceptive Trade Practice Legislation" 46 Tul.L.Rev. 724. It is upon these considerations that legislatures throughout the country, including Missouri, have created this new remedy and have implemented it by authorizing the issuance of injunction where consumer fraud is found. That legislative determination constitutes sufficient authorization without more for the propriety of an injunction in a case under this statute.

Defendant also attacks the injunction here on the ground that the injunction deprives it of constitutional rights. That contention can be disposed of summarily. The question presented is not one of construing the constitution but only a determination of whether defendant's conduct contravenes the statute. The constitutional contention is purely colorable. See Smith v. Smith, 485 S.W.2d 143, l. c. 146 (Mo.App. 1972).

▌ Valid criticism does lie against the injunction issued, however, because of the overly broad prohibitions which it imposes upon the defendant. Most of the prohibitions contained in the injunction are specific in nature and relate to practices either found to have been committed by defendant or which can be considered persuasively connected with those violations. On the other hand, two of the prohibitions do not meet that test. The first of these is paragraph (c) which enjoins defendant from representing that any automobile is a new automobile, if it knows or has reason to know that it had been owned or leased by a third party, had been previously titled, or had been driven as a demonstrator. The second of these prohibitions is paragraph (h) which enjoins defendant from "engaging in deception, fraud, misrepresentation or concealment or omission of material facts with the intent that others rely thereon in connection with the sale of automobiles, services, parts and accessories".

▌ The law of this State has long been that an injunction must clearly and specifically describe the acts and things enjoined. National Rejectors, Inc. v. Trieman, 409 S.W.2d 1, 1. c. 18 (Mo. banc 1966); Commission Row Club v. Lambert, 161 S.W.2d 732, 1. c. 736 (Mo.App., 1942); Magel v. Gruetli Benev. Soc. of St. Louis, 203 Mo. App. 335, 218 S.W. 704 (1920). The reason for this rule is well stated in the Lambert case as follows:

"The remedy of injunction is of such drastic and dictatorial nature that it should never be called in force except the decree name and describe the acts and things enjoined,—not just generally so as to be subject to misunderstanding and confusion by those against whom it is directed,—but clearly and specifically so that both the complainant and the defendants may know their rights."

See also in support: National Labor Relations Board v. Express Pub. Co., 312 U.S. 426, 1. c. 433–436, 61 S.Ct. 693, 85 L.Ed. 930; Federal Trade Commission v. Morton Salt Co., 334 U.S. 37, 1. c. 51, 68 S.Ct. 822, 92 L.Ed. 1196; Federal Trade Commission v. Henry Broch and Co., 368 U.S. 360, 1. c. 367–368, 82 S.Ct. 431, 7 L.Ed.2d 353. The Merchandising Practices Act itself reinforces this requirement of a sharp focus in the injunctional order, by the provision of § 407.100 that if a person is engaged in any unlawful practices the attorney general may obtain an injunction "prohibiting such person from continuing *such practices* or engaging therein or doing any acts in furtherance thereof." (Emphasis added).

Paragraph (c) of the injunction against representations concerning "new automobiles" cannot stand because there is no sufficient evidence to support a finding that defendant has ever made any false representation to this effect. Paragraph (h) of the injunction cannot stand because it undertakes to enjoin defendant from all acts which are illegal under the statute, wholly unspecified, and without regard to any particular charge or evidence of previous violation.

▌ The judgment is therefore modified by striking out paragraphs (c) and (h). As so modified, the judgment is affirmed. Even though appellant has been successful in obtaining some relief on this appeal, which might normally call for a division of costs between the parties, no division is permissible here since there is no statutory authority for assessment of costs against the State. Automagic Vendors, Inc. v. Morris, 386 S.W.2d 897, 1. c. 900 (Mo. banc 1965); Murphy v. Limpp, 347 Mo. 249, 147 S.W.2d 420 (1940). This rule is not changed by § 407.130 R.S.Mo.1969, V.A.M.S., since that section provides only for assessment of costs against a defendant in a suit brought under the Merchandising Practices Act, but does not authorize assessment of costs against the attorney general.

All concur.