Raymond DAVIS and Adjusters, Inc., for the People, Appellants,

v.

DIRECTOR OF INSURANCE, MISSOURI DEPARTMENT OF INSURANCE, Respondent.

No. WD 47742.

Missouri Court of Appeals, Western District.

April 12, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied May 31, 1994.

Application to Transfer Denied Aug. 15, 1994.

Stephen H. Gilmore, Clayton, for appellants.

Joseph R. McMahon, Asst. Gen. Counsel, Mo. Dept. of Ins., Jefferson City, for respondent.

Before SMART P.J., and LOWENSTEIN and FENNER, JJ.

LOWENSTEIN, Judge.

This is an appeal from the revocation of the Appellants' public adjuster licenses issued by the respondent, Department of Insurance. The Administrative Hearing Commission (AHC) concluded the Appellants violated § 325.035.1, RSMo.Supp 1991, by engaging in "false, fraudulent and misleading business practices." This statute authorizes the Director of Insurance to discipline the licenses of those engaged in the public adjustment business. Appellants assert: 1) the legal standard applied by the AHC was erroneous; 2) the AHC's decision was not supported by substantial and competent evidence, in that Appellants' conduct did not rise to the level of a "business practice"; and 3) the circuit court erred in denying the admission of additional evidence.

The Director of Insurance filed a complaint, later amended, seeking a determination that the public adjuster licenses of Ray Davis (Davis), William Pinnon (Pinnon) and Adjusters Inc. for the People (Adjusters) and the public adjuster solicitor license of Clevester Hughes (Hughes) be disciplined for: 1) solicitation, and 2) false and fraudulent or misleading business practices. Davis, Hughes and Pinnon worked for Adjusters. A hearing was conducted. No cause for disciplinary action was found as to Pinnon or Hughes. No one was found to have made improper solicitation. Appellant Davis was found to have knowingly engaged in false, fraudulent or misleading business practices as to two separate clients; the AHC imputed a finding of deceptive business practices to Adjusters Inc. (Adjuster's and Davis together are the sole Appellants). The Director's revocation of the licenses was upheld by the AHC. The Cole County Circuit Court affirmed.

All of the events leading up to this action took place in the St. Louis metropolitan area. The factors favorable to the AHC decision now follow.

### Pickett and Calvin

In August, 1988 fire damaged Mrs. Pickett and Mrs. Calvin's home (Calvin was Pickett's daughter and co-owned the home). Appellants entered into a contract with Pickett providing Adjusters would represent Pickett and Calvin in the presentation, adjustment and settlement of their claims with their insurance company for 10% of the claim amount paid by the insurer. Hughes took Pickett to see property at 5212 Vernon, and

told her that Virgil "Buddy" Hollis (Hollis) had done the work on the home and asked if she would like to purchase it. She declined the offer to purchase, but was impressed by Hollis' work. Hughes did not show or recommend any other contractor's work to Pickett. Pickett and Calvin hired Hollis to do the necessary repairs to their home. They found the quality of his work unacceptable. Trouble areas included a leaky front porch ceiling, plumbing problems and a poorly constructed back porch railing. No plumbing was roughed in on the second floor, and there were no water pipes on the first floor. They complained to Hughes about the quality of the work who, in turn, relayed the complaints to appellant, Davis.

### Anderson–Foote

On April 22, 1989 Mrs. Anderson–Foote had a fire at her home in Hanley Hills, Mo. On the evening of the fire she was contacted by Hughes and entered into a written contract with him. The contract was the same as the one entered into by Pickett. Davis sent three contractors to Anderson–Foote's home to submit bids for the work. Hollis was one of the contractors. Hollis' bid was the lowest, and was subsequently lowered since the insurance would not pay the full amount of his original bid. Anderson–Foote asked Davis his advice in choosing the contractor. Davis endorsed Hollis, saying he was a "good guy", he did "good work" and that he had done work on Davis' office. Anderson–Foote was impressed with the office. Hollis had never done work on Davis' office. Anderson–Foote accepted Hollis' bid based on Davis' endorsement and the fact he had the lowest bid.

Anderson–Foote was dissatisfied with the quality of materials and workmanship used in her repairs. Among her complaints were two-toned painting, areas where paint was dripped "all over the place," the front awning did not match the others, the windows were installed crooked, the paint line from the raw edges of the work were visible, glass was not installed in the windows until water and frost had seeped into the house, and that generally things were not being fixed appropriately.

She further complained that Hollis' appearances were sporadic.

Anderson–Foote began contacting Davis with her complaints approximately two to three weeks after Hollis began his work. She called Davis several other times expressing her concerns, especially since Hollis kept "riding" her about money, saying he couldn't work unless he got more money. Anderson–Foote's understanding was that the insurance company was to make payments for the repairs. Hollis' activity slowed down considerably because of his demands for money.

Anderson–Foote sent Davis a copy of a letter she sent to the Better Business Bureau and the consumer advocate at a local television station registering her complaints regarding Hollis. Anderson–Foote eventually signed a release with Hollis because she felt her "back was against the wall," and that she had to sign it if she wanted the work completed. She said it did not signify her satisfaction with the quality of his work. Simultaneously, Hollis signed a list of work yet to be completed.

### Reynolds

In January, 1990 fire damaged Judy Reynolds' home. Pinnon came to her house and contracted with Adjusters, under the same terms as the others.

Reynolds received bids on the repairs from Hollis and another contractor. Davis and Pinnon met with Reynolds and her father to discuss necessary paperwork and the selection of a contractor. Davis strongly recommended Hollis stating he was, "a good Christian man," that Adjusters had worked with him a "long time," he did "a real good job" and that he was an expert at repairing fire damage. Davis, in a separate conversation with Reynolds' father, further assured him of the quality of Hollis' workmanship and said Hollis had repaired many fire damaged buildings. Reynolds selected Hollis because of Davis' strong endorsement, and because she had no reason to believe Pinnon or Davis had any reason to "sway me wrong." She was unaware of Pickett's or Anderson–Foote's complaints.

Reynolds did not stay at her home during the repairs but, rather, made periodic visits. She returned home in May, 1990 but Hollis had not finished the work as promised. Reynolds had several problems with Hollis. First, Hollis had not completed the work as promised. This was problematic for Reynolds because she had rented new furniture which would be delivered based on the time frame Hollis had given. The carpet was being laid the day the furniture was delivered. Furthermore, the carpet was not installed properly—seam lines were very poorly put together. Additionally, the air conditioner and furnace were not installed (when they were installed it was done improperly), the floorboards were not of equal thickness in certain locations, the walls were not properly treated for fire damage or properly painted, and the kitchen paneling buckled.

In early June, after Reynolds moved back into her home, the electricity was shut off because Hollis failed to obtain an occupancy permit for the house. On June 11, 1990 the local authorities determined the wiring was not properly installed and the home was unsafe for occupancy. Reynolds reported this development to Davis the following day. Reynolds' family had to move out of its home because the furnace emitted toxic fumes. Plumbing and electrical wiring were so inadequately repaired that the building department condemned their home. Reynolds also had to remove her furniture from her home because the toxic fumes emitted from the furnace were penetrating into the furniture.

Reynolds had Davis and Pinnon out to look at the house. In order to repair the damage Hollis' repairs caused, Reynolds had to take out a second mortgage. The house had to be gutted and everything had to be redone. Hollis' had left materials at Reynolds' home. Some of these materials were used by the new contractor to correct damage caused by Hollis.

■ This court reviews the findings of the administrative agency and not the circuit court. *Cabool v. Missouri State Bd of Mediation,* 689 S.W.2d 51, 53 (Mo. banc 1985). In reviewing factual questions, review is limited to determining whether the AHC's action was supported by competent and substantial evidence upon the whole record. *Ross v. Robb,* 662 S.W.2d 257, 259 (Mo. banc 1983).

## I. PROPER LEGAL STANDARD

■ Appellants assert AHC did not apply the proper legal standard because the AHC did not make a ruling that there was a "conscious disregard" of § 375.930–375.948, RSMo 1986, or any other provision under the Unfair Trade Practice Act. The Director alleged, and AHC found, that Appellants "engaged in false, fraudulent or misleading business practices" pursuant to § 325.035, RSMo Supp.1991, the statute which governs regulation of adjusters. § 325.035 provides in pertinent part:

**325.035 Refusal to license, revocation, or suspension, grounds for**

1. *Whenever the director shall be satisfied* that an applicant for license does not have the necessary qualifications to engage in the public adjustment business, or when he shall be satisfied *that a holder of such license has engaged in false, fraudulent, or misleading business practices, the director may refuse to issue the license or may revoked or suspend the license.* Such refusal or suspension shall be accomplished pursuant to the provisions of chapter 621 RSMo. and shall based on one or more of the following grounds:

   (1) A violation of any provision of chapter 325 RSMo or

   (2) Any ground under subdivisions (2) to (12) of subsection 1 of section 375.141 RSMo.

2. The director may suspend the license of any holder thereof for such period as he may determine proper or revoke such license if as a result of his discipline hearing he deems such action to be necessary as being in the public interest. (emphasis added. Amended August 28, 1991)

Subsections (1) and (2) were not applied because the events which caused Appellants to be disciplined took place prior to August, 1991, the time this portion of the statute became effective. The version of § 325.035, RSMo.1986, which was applied contained the same substantive provision as that underlined above, as well as a provision for the

suspension of the license for a period determined by the director as necessary in the public's interest. Appellants assert error in application of § 325.035 rather than § 375.-934, RSMo.1986 (Unfair Practices Act provision), because the AHC, in its Findings of Fact and Conclusions of Law, used the term "deceptive business practices." Upon review, we note that the Commission applied § 325.035 as pleaded by the Director when it applied the facts and made its findings. Furthermore, § 375.934 applies to insurers, not to adjusters. The term "deceptive" was used as a synonym for fraudulent or misleading business practices, as evident by the AHC's analysis of the definition of key terms. Since § 375.934 was not pleaded nor argued before the AHC, it was not erroneous for the court to apply § 325.035. Point one is denied.

## II. Sufficiency of Evidence to Establish a Showing of "Business Practices"

■ The second point is twofold. First, there was not substantial and competent evidence to support the finding; and, second, that even if the evidence is substantial and competent, Appellants' limited behavior did not constitute "business practices" as contained in § 325.035. This court's review is limited to determining whether the decision is supported by competent and substantial evidence on the whole record in the light most favorable to the agency's decision, deferring to the agency on matters of weight to be given to conflicting evidence. *Farnsworth v. Missouri Dept. of Corrections and Human Resources*, 747 S.W.2d 180 (Mo.App.1988) (citing *Ballew v. Ainsworth*, 670 S.W.2d 94, 102 (Mo.App.1984)). The evidence which established Appellants' practices, as set out in the factual portion of this opinion, will not be repeated. The evidence established Davis had advised clients to contract with Hollis, despite his knowledge of Hollis' poor skills and workmanship. Davis misrepresented Hollis as a fire restoration expert, and stated that Hollis had done work which he knew Hollis had not performed.

■ The second part of Appellants' argument is that Davis' conduct did not amount to "business practices." They argue a showing of "repeated or customary action" is re-

quired. While there is no hard and fast rule of what constitutes business practices, the court finds Appellants' conduct constituted business practices. Black's Law Dictionary, Fourth Edition, defines practices as "a succession of acts of a similar kind or in a like employment." Clearly, Appellants' conduct meets the standard of a succession of acts of a similar kind. Appellants would have the court declare a "magic" number of times a person must act wrongly before his conduct reaches the level of "practices." This court held in *State ex rel. Danforth v. Independence Dodge, Inc.*, 494 S.W.2d 362 (Mo.App. 1973) that three instances of making false representations to consumers constituted a practice declared unlawful by § 407.010 to 407.130 RSMo., 1969 under the Merchandising Practices Act. Similarly, while there was a relatively small number of incidents, the actions were repeated acts of a similar nature, causing sufficient harm to the consumer to qualify as "business practices" under § 325.035. "In order to give broad scope to the statutory protection and to prevent ease of evasion because of overly meticulous definitions, many of these laws, such as the Missouri statute do not attempt to define deceptive practices or fraud but merely declare unfair or deceptive acts or practices unlawful." *State ex rel. Danforth v. Independence Dodge, Inc.*, 494 S.W.2d 362 (Mo. App.1973), quoting Commerce Clearing House, Poverty Law Rep., Vol. 1 § 3200 (practices regarding the Merchandising Practices Act). This court seeks to ascertain the intent of the lawmakers from the language used, to give effect to that intent, if possible, and to consider words in their plain and ordinary meanings. *State ex rel. LeBeau v. Kelly*, 697 S.W.2d 312, 314 (Mo.App.1985). Furthermore, the court is to presume that the legislature intended a logical, rather than an absurd or unreasonable result. *Id.* at 315. Here the object of the law is to protect the public from such abuses as took place in the case at bar. See *Newman v. Melahn*, 817 S.W.2d 588, 590 (Mo.App.1991). To hold Appellants' repeated performance of recommending and making misleading statements as to Hollis' skills did not violate the statute, would lead to an unreasonable result.

This court holds there was competent and substantial evidence to support AHC's find-

ings that Appellants' conduct constituted false, fraudulent, or misleading business practices. This point is denied.

### III. Additional Evidence

■ In circuit court, Appellants unsuccessfully sought to introduce Hollis' deposition as additional evidence. § 536.140, RSMo., 1986 Subsection 4. provides the court:

"*may* hear and consider additional evidence if the court finds that such evidence in the exercise of reasonable diligence could not have been produced or was improperly excluded at the hearing before the agency...." (emphasis added)

§ 536.140.4 is discretionary in its nature. See *Wagner v. Jackson County Bd. of Zoning Adjustment,* 857 S.W.2d 285, 289 (Mo. App.1993). Appellants make no assertion that it was an abuse of discretion to deny the admission of the deposition; rather, they assert it would not have been an abuse of discretion for it to have been admitted. It was not an abuse of discretion to deny the admission of evidence since there was no showing the evidence was denied by the AHC, or that it could not have been produced at the administrative hearing. This point is denied. The judgement is affirmed.

All concur.