# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————

Nos. 96-3266/3457

———————

Vicki Grabinski,                                    *
                                                    *
     Appellee/Cross-Appellant,    *
                                                                        *
                                                    *
    v.                              *    Appeals from the United States
                                                    *    District Court for the Western
Blue Springs Ford Sales, Inc.; Blue                 *    District of Missouri.
Springs Ford Wholesale Outlet, Inc.;                *
Don Isom; Fred Graham; and Bob                      *
Dudley,                                             *
                                                    *
     Appellants/Cross-Appellees.  *

———————

Submitted:  September 11, 1997

Filed:    February 12, 1998

———————

Before BOWMAN, Circuit Judge, HENLEY,[1] Senior Circuit Judge, and MORRIS
    SHEPPARD ARNOLD, Circuit Judge.

———————

—————————

[1]Judge Henley died on October 18, 1997.  This opinion is consistent with his vote at the panel's conference following oral argument on September 11, 1997.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Blue Springs Ford Sales, Inc. (BSF), Blue Springs Ford Wholesale Outlet, Inc. (Outlet), and three Outlet employees, Don Isom, Fred Graham, and Bob Dudley, appeal from a judgment entered on jury verdicts in favor of Vicki Grabinski on her claims based on the common law and on the Missouri Merchandising Practices Act, see Mo. Rev. Stat. §§ 407.010-407.1020. The jury awarded Ms. Grabinski $7,835 in actual damages and $210,000 in punitive damages. Ms. Grabinski cross-appeals from the trial court's denial of her motion for attorney fees. We affirm the judgment as to liability and actual damages, reverse and remand as to punitive damages, and dismiss the cross-appeal as moot.

I.

Bob Balderston is the owner and president of BSF, Mark Talbott is the vice-president and general manager of BSF, and Tom Riddings is the president and general manager of the Outlet. Mr. Balderston, Mr. Talbott, and Mr. Riddings own the Outlet in equal shares. About seventy percent of the Outlet's cars come from BSF.

Early in 1993, BSF took a 1984 GMC Jimmy truck as a trade-in, and Steve Lotspeich, BSF's used-car manager, examined it. As a general rule, Mr. Lotspeich looked at vehicles for about ten to fifteen minutes and took them for a short drive at speeds of up to thirty-five miles an hour. Because the Jimmy was to be wholesaled, however, Mr. Lotspeich probably spent less time examining it. Mr. Lotspeich then called Mr. Isom, the Outlet's business manager, to offer the Jimmy for sale. Mr. Lotspeich, who expected his descriptions of vehicles to be passed along to the Outlet's customers, described the Jimmy as "very nice" and stated that it was "driving fine" and needed only a cleanup and standard servicing.

A few days later, Ms. Grabinski called the Outlet and spoke to Mr. Graham, a salesman, about buying a dependable four-wheel-drive vehicle. Mr. Graham told her

-2-

about the Jimmy.  Later that day, Ms. Grabinski and her fiancé, Matt Walker, went to the Outlet.  Mr. Graham showed them the Jimmy, telling them that except for an obvious crack in the windshield it  was in  "A-1" condition.  He also stated that it had never been in a wreck, had had only one owner, and ran perfectly.  After a short test drive and some negotiations, Ms. Grabinski agreed to pay $5,500 for the Jimmy.  When Ms. Grabinski talked to Mr. Isom about financing, he assured her that she was getting a good deal because the Jimmy was dependable and in "excellent condition."  Ms. Grabinski then put a deposit on the Jimmy.

After obtaining financing from a bank, Ms. Grabinski and Mr. Walker returned to the Outlet the next week to close the deal.  Mr. Graham told her that she had to sign a "tow-away" affidavit, which, in relevant part, stated:

> I understand that the [Jimmy] which I purchased from [the Outlet] has not been Missouri State inspected and is considered to be in an unsafe mechanical condition.  This vehicle is being purchased for the purpose of rebuilding, salvage, or junk.  I understand that the vehicle cannot be operated in its present condition[;] therefore I agree that the vehicle be towed or hauled from its place of purchase.

Under Missouri law, if a purchaser of a vehicle executes an affidavit stating that the vehicle is being purchased for "junk, salvage, or for rebuilding," the seller is exempt from a state requirement that "[a]t the seller's expense [the] vehicle ... shall  immediately prior to sale be fully inspected regardless of any current certificate of inspection and approval, and an appropriate new certificate of inspection and approval ... shall be obtained."  See Mo. Rev. Stat. § 307.380.

After Ms. Grabinski refused to sign the affidavit, Mr. Graham, contrary to the law, told her that Missouri law required buyers of all vehicles to sign such an affidavit because until the vehicle was inspected it was considered unsafe. Ms. Grabinski still refused to sign, asking why she had to sign the affidavit since she needed a dependable

vehicle and did not have any more money to put into the Jimmy.  Mr. Isom and Mr. Dudley, another salesman, then came into Mr. Graham's office.  During a fifteen-minute discussion, Mr. Graham, Mr. Isom, and Mr. Dudley tried to persuade Ms. Grabinski to sign the affidavit, claiming that use of the affidavit was "universal" in sales of vehicles in Missouri.  They also assured her that the Jimmy was not a "piece of junk."  Mr. Dudley and Mr. Isom told her the only reason that it would not pass inspection was the cracked windshield and reiterated that it had never been wrecked.  Ms. Grabinski then signed the affidavit and completed the sale, and, after the Outlet's mechanic replaced the spark plugs, she drove the Jimmy off the lot.

About a week later, while Mr Walker was driving the Jimmy back from Oklahoma, the engine began overheating.  Mr. Walker had the vehicle towed back to the Outlet.  Mr. Isom told Ms. Grabinski that the engine heads were cracked and offered to repair them for $360.  Ms. Grabinski had the repair done elsewhere.  After the repair, the Jimmy continued to experience difficulties, including lack of power, swaying, and low gasoline mileage.

Ms. Grabinski soon undertook an investigation of the Jimmy's history.  She discovered that one James Cox had bought the vehicle in 1986 from a wrecking company, which had obtained it as salvage after it sustained considerable damage in a roll-over accident.  Mr. Cox then spent about two or three months rebuilding the Jimmy.  When Ms. Grabinski and Mr. Walker went back to the Outlet and confronted Mr. Isom about what she had learned, Mr. Isom offered to repurchase the Jimmy, but at a substantial reduction from the price that Ms. Grabinski had paid because it needed repair.  Mr. Isom told them that if the Jimmy was not in good condition, BSF had "screwed" the Outlet because BSF had represented that it was in "good shape."

Ms. Grabinski then filed suit, raising claims under the common law of fraud and under the Missouri Merchandising Practices Act, the latter of which provides that the "use or employment by any person of any deception, fraud, ... misrepresentation, [or]

-4-

unfair practice ... in connection with the sale ... of any merchandise in trade or commerce ... is declared to be an unlawful practice." See Mo. Rev. Stat. § 407.020.1.

Ms. Grabinski subsequently replaced the Jimmy's engine, and the defendants then offered to repurchase the Jimmy for the sale price and certain costs but less depreciation. The offer was not contingent on Ms. Grabinski's dismissal of her lawsuit. Ms. Grabinski rejected the offer and eventually traded the Jimmy.

At trial, in addition to presenting evidence relating to the sale and the history of the Jimmy, Ms. Grabinski presented the expert testimony of Richard Diklich, an instructor in automotive technology. Mr. Diklich testified that based on his examination of the Jimmy there were signs of wreck damage, such as repainting and poor door fit, which should have been obvious to a vehicle appraiser on a visual examination. He also opined that the power difficulty should have been obvious to an appraiser during a test drive. According to Mr. Diklich, had the condition of the Jimmy been as represented, it would have been worth $8,000 but at the time of purchase was worth $2,500 to $3,000.

Ms. Grabinski also presented evidence that BSF knew that the Outlet used tow-away affidavits in sales of vehicles, in violation of Missouri law. Mr. Talbott, vice-president and general manager of BSF and vice-president of the Outlet, read from a July, 1990, automobile association bulletin advising its members, which included BSF, that the "Missouri Attorney General's Office had published guidelines concerning the proper use of the 'junk, salvage or rebuilding affidavit.' " The bulletin warned: "You CANNOT substitute a 'junk affidavit' for a motor vehicle safety inspection" if "[t]he vehicle is operable and is driven rather than towed or hauled away." Mr. Talbott testified that shortly before trial the Outlet stopped using the affidavits.

The jury awarded actual damages of $7,835. It also awarded punitive damages of $100,000 against the Outlet, of $50,000 against BSF, of $30,000 against Mr. Isom, of $20,000 against Mr. Dudley, and of $10,000 against Mr. Graham.

After the verdicts, the trial court informed the parties that because under state law the matter of statutory punitive damages was left to the discretion of the court, the court would not enter judgment until it heard argument on the matter of punitive damages and on Ms. Grabinski's request for statutory attorney fees. Before argument, the defendants filed a memorandum asserting that the jury's punitive damages awards were excessive, and, with the exception of BSF, they submitted affidavits of their net worth in support. The trial court did not rule on the matters at the conclusion of argument, but later held that it would not consider the net-worth affidavits and could not "second guess" the jury's verdicts because of "equitable considerations." The trial court also denied Ms. Grabinski's request for attorney fees on the ground that the punitive damages awards were "generous." The trial court entered judgment in accordance with the verdicts. The defendants filed a postjudgment motion for judgment as a matter of law; in the alternative, they requested a new trial or remittitur, asserting that the punitive damages awards were excessive under state law and the United States Constitution.

II.

The defendants first argue that the trial court erred in denying their motion for judgment as a matter of law; they assert that Ms. Grabinski failed to prove that they made misrepresentations as to existing facts. See State ex rel. Danforth v. Independence Dodge, Inc., 494 S.W.2d 362, 368 (Mo. Ct. App. 1973). In particular, BSF argues that Mr. Lotspeich's representation that the Jimmy was "very nice" was merely an expression of opinion and thus not actionable. We disagree.

"A given representation can be an expression of opinion or a statement of fact depending upon the circumstances surrounding the representation." Carpenter v.

-6-

<u>Chrysler Corp.</u>, 853 S.W.2d 346, 358 (Mo. Ct. App. 1993). In the circumstances here, we believe that Mr. Lotspeich's representation that the Jimmy was "very nice" could reasonably be taken as a statement of fact as to the condition of the Jimmy. <u>See</u> <u>id.</u> (salesperson's statement that car was "good" and "reliable" was misrepresentation of fact). In addition, as Ms. Grabinski points out, Mr. Lotspeich also stated that the Jimmy was "driving fine" and "only needed a clean-up and standard service," which were clearly misrepresentations as to facts.

Contrary to BSF's argument, moreover, the fact that Mr. Lotspeich's statements were not made "directly to" Ms. Grabinski is not a defense to her damage claim. <u>Freeman v. Myers</u>, 774 S.W.2d 892, 894 (Mo. Ct. App. 1989). BSF is liable to Ms. Grabinski because Mr. Lotspeich expected his representations "to extend to and be relied upon by a retail purchaser of the car from the automobile dealership to whom [BSF] sold the car." <u>Id.</u> at 893-94. Not only did Mr. Lotspeich testify that he knew that the Outlet relied on his expertise in examining vehicles and "expected [the Outlet] to be able to pass on things that [he] represented," there was evidence from which a jury could reasonably have concluded that the Outlet had in fact passed on Mr. Lotspeich's representations about the Jimmy to Ms. Grabinski. Mr. Isom and Mr. Dudley both testified that the information that they received about the Jimmy came from Mr. Lotspeich and that they relied upon him to disclose problems, such as if the Jimmy had been wrecked. Especially significant, we think, is Mr. Isom's statement to Ms. Grabinski that if the Jimmy was in bad shape when she bought it, BSF had "screwed" the Outlet by representing that it was in "good shape."

Nor, contrary to its arguments, can BSF be shielded from liability because Mr. Lotspeich's brief visual inspection and test drive might not have provided him with knowledge of the Jimmy's defects. It is sufficient that Mr. Lotspeich "made the representations with the consciousness that [he] was without knowledge as to their truth or falsity, when, in fact, they were false." <u>Scott v. Car City Motor Co., Inc.</u>, 847 S.W.2d 861, 865 (Mo. Ct. App. 1992). In any event, the jury could reasonably have

concluded that Mr. Lotspeich, as an experienced vehicle appraiser, knew or should have known that the Jimmy had been in a wreck because of obvious signs of damage and knew or should have known of its power problems during the test drive.

The statements of Mr. Isom, Mr. Graham, and Mr. Dudley that the Jimmy was in excellent condition, had had one owner, and had never been wrecked were likewise actionable misrepresentations. We reject Mr. Dudley's argument that because he did not speak to Ms. Grabinski until a week after she put down her deposit on the Jimmy, she could not have relied on his representations in deciding to buy the Jimmy. The defendants' evidence was that Mr. Dudley told Ms. Grabinski that if she was "uncomfortable" with signing the tow-away affidavit, the Outlet would be "happy to return her money to her and just end the sale right then." Ms. Grabinski testified that she completed the sale only because she relied on the misrepresentations, including Mr. Dudley's, that use of the affidavit was "universal" in sales of vehicles in Missouri and that despite what the affidavit said, the Jimmy was not a "piece of junk" and was, in fact, in excellent condition.

The defendants also argue that there was insufficient evidence to support the jury's award of $7,835 in actual damages. We disagree. At a minimum, Ms. Grabinski was entitled to "the difference between the actual value of the property and what its value would have been if it had been as represented." Sunset Pools v. Schaefer, 869 S.W.2d 883, 886 (Mo. Ct. App. 1994) ("benefit-of-bargain" rule applies to fraud and Merchandising Practices Act claims). Here Mr. Diklich testified that the Jimmy was worth $2,500 to $3,000 but would have been worth $8,000 as represented. Ms. Grabinski was also entitled to recover other expenses of which there was evidence, including interest charges, repair costs, lost time from work, excessive gasoline costs, towing charges, and other costs relating to "problems arising from the fraudulent transaction." Hughes v. Box, 814 F.2d 498, 503 (8th Cir. 1987) (applying Missouri law); see also Carpenter, 853 S.W.2d at 361. The jury's award thus finds ample support in the record.

III.

We turn now to the defendants' arguments concerning the punitive damages awards. They contend that the trial court erred in instructing the jury as to a mitigating circumstance, in rejecting their postverdict affidavits of net worth, and in failing to review the verdict for excessiveness.

The trial court instructed the jury that it could consider the defendants' offer to repurchase the Jimmy as mitigating evidence with respect to punitive damages, but also instructed the jury that Ms. Grabinski "reasonably rejected the offer because of uncertain details" and because her acceptance "would indirectly create risks" for her lawsuit. The defendants contend that whether Ms. Grabinski's rejection of the offer was reasonable was a question of fact for the jury.

In Missouri, evidence of a defendant's conduct subsequent to that defendant's wrongful acts is admissible to mitigate punitive damages if it is " 'so connected with the particular acts as tending to show defendant's disposition, intention, or motive in the commission of the particular acts for which damages are claimed.' " Maugh v. Chrysler Corp., 818 S.W.2d 658, 663 (Mo. Ct. App. 1991), quoting Charles F. Curry and Co. v. Hedrick, 378 S.W.2d 522, 536 (Mo. 1964). Because Ms. Grabinski was not obligated to accept the repurchase offer and because her reasons for rejecting the offer are irrelevant to the defendants' state of mind at the time of the transaction, see Maugh, 818 S.W.2d at 664, any error in the instruction is harmless. Given all of the circumstances of this case, including the fact that the offer was made after the filing of the complaint and testimony that the offer was intended "to avoid the expense of litigation," the defendants, as the trial court noted, "got more mileage out of the [evidence] than they were entitled to."

We next consider the defendants' argument that the trial court erred in refusing to consider their postverdict affidavits of net worth. The defendants contend that

because the purposes of punitive damages are punishment and deterrence, net worth is an essential consideration. They concede that in Missouri "[w]hile the net worth of a party is admissible on the issue of punitive damages, there is no requirement that the net worth be shown." Mullen v. Dayringer, 705 S.W.2d 531, 536 (Mo. Ct. App. 1985). The defendants suggest, however, that as a matter of federal constitutional law a trial court in its postverdict review must consider evidence of a defendant's net worth. Ms. Grabinski responds that the defendants' failure to put on evidence of their net worth at trial constitutes a waiver.

We agree with Ms. Grabinski. In Kemezy v. Peters, 79 F.3d 33, 34 (7th Cir. 1996), the Seventh Circuit held that as a matter of federal law it is a defendant's burden to introduce evidence of net worth before a jury for purposes of minimizing a punitive damages award. The court noted that none of "the purposes that are served by the awarding of punitive damages ... depends critically on proof that the defendant's income or wealth exceeds some specified level." Id. at 35 (emphasis in original). Although the court acknowledged "that losing $1 is likely to cause less unhappiness (disutility) to a rich person than to a poor one," id., the court likened an award of punitive damages to a fine. Id. at 36. The court observed that "[t]he usual practice with respect to fines is not to proportion the fine to the defendant's wealth, but to allow him to argue that the fine should be waived or lowered because he cannot possibly pay it." Id. In the context of punitive damages, we agree with the Seventh Circuit that "[t]he defendant who cannot pay a large award of punitive damages can point this out to the jury so that they will not waste their time ... by awarding an amount that exceeds his ability to pay." Id. Accord Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 373 (2d Cir. 1988) ("it is the defendant's burden to show that his financial circumstances warrant a limitation of the [punitive damages] award").

The defendants also argue that the trial court erred in failing to review the jury's award of punitive damages, as required by Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 20 (1991). Ms. Grabinski suggests, however, that the trial court conducted an

adequate review because it held postverdict argument on the matter of punitive damages. Cf. TXO Prod. Corp. v. Alliance Resources Corp., 509 U.S. 443, 464-65 (1993) (plurality opinion). In this case, however, the trial court heard postverdict argument not because of due process concerns, but because it believed that under state law statutory punitive damages were a matter for the court, not the jury. (Although the issue was not raised on appeal, we note that, contrary to the trial court's belief, in a diversity case "[f]ederal law controls the issue" of the right to a jury trial, "even in cases ... where the federal court is enforcing a state-created right and 'even when a state statute ... would preclude a jury trial in state court.' " Kampa v. White Consol. Indus., Inc., 115 F.3d 585, 587 (8th Cir. 1997), quoting Gipson v. KAS Snacktime Co., 83 F.3d 225, 230 (8th Cir. 1996). Where, as here, the state statute " 'allows, and the plaintiff seeks, at least in part a legal remedy,' " the plaintiff has a right to a federal jury trial. Kampa, 115 F.3d at 586, quoting Gipson, 83 F.3d at 231.)

Even though the trial court heard postverdict argument for a purpose other than reviewing the verdicts as required by Haslip, if at that argument the court had rejected the defendants' excessiveness arguments and indicated its agreement with the jury's verdicts, a remand would perhaps be unnecessary. At that argument, however, the trial court stated that it would take the matter under advisement, and in its opinion, the court did not treat the jury verdicts as advisory and review them for excessiveness, as it indicated it would do. To the contrary, the trial court held that it was bound by "equitable considerations" to enter judgment in accordance with the verdicts, relying on the principle that a court is collaterally estopped from relitigating a jury's factual findings when the court later considers equitable remedies on the same claim. See, e.g., Brownlee v. Yellow Freight Syst., Inc., 921 F.2d 745, 749 (8th Cir. 1990). That reliance was misplaced. Not only are punitive damages a legal remedy, but the trial court had a duty under state and federal law to review the awards for excessiveness.

Alternatively, Ms. Grabinski urges us to conduct a review on our own by applying the principles laid out in BMW of North America, Inc. v. Gore, 517 U.S. 559,

-11-

116 S. Ct. 1589 (1996). In <u>Gore</u>, the Supreme Court held that in determining whether a punitive damages award was so "grossly excessive," 517 U.S. at _____, 116 S. Ct. at 1592, as to violate federal due process rights, a court should consider "the degree of reprehensibility of the defendant's conduct," 517 U.S. at _____, 116 S. Ct. at 1599, the ratio of punitive damages to compensatory damages, 517 U.S. at _____, 116 S. Ct. at 1601-02, and "the civil or criminal penalties that could be imposed for comparable misconduct," 517 U.S. at _____, 116 S. Ct. at 1603.

We believe, however, that <u>Gasperini v. Center for Humanities, Inc.</u>, 116 S. Ct. 2211 (1996), controls this case. In <u>Gasperini</u>, the Second Circuit had vacated a jury's damages award pursuant to a state statute providing that an appellate court "shall determine" whether a verdict is excessive. <u>Id.</u> at 2216. Although the Supreme Court held that the relevant state's excessiveness standard applies in diversity cases, <u>id.</u> at 2221, the Court was concerned that the application of the statute might conflict with the reexamination clause of the Seventh Amendment, which provides that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law."

After reviewing the common law, the Court concluded that "Seventh Amendment constraints ... lodge[d] in the district court, not the court of appeals, primary responsibility" for review of a jury's verdict for excessiveness. <u>Gasperini</u>, 116 S. Ct. at 2225. The Court also believed that practical considerations supported its holding, noting that "[t]rial judges have the 'unique opportunity to consider the evidence in the living courtroom context,' " <u>id.</u>, quoting <u>Taylor v. Washington Terminal Co.</u>, 409 F.2d 145, 148 (D.C. Cir. 1969), <u>cert. denied</u>, 396 U.S. 835 (1969), "while appellate judges see only the 'cold paper record,' " <u>Gasperini</u>, 116 S. Ct. at 2225, quoting <u>Gasperini v. Center for Humanities, Inc.</u>, 66 F.3d 427, 431 (2d Cir. 1995), <u>vacated</u>, 116 S. Ct. 2211 (1996).

The Court went on to hold that appellate review of the trial court's determination in this regard is limited to an abuse of discretion. <u>Gasperini</u>, 116 S. Ct. at 2225. In our

case, since there has been no review by the trial court we can hardly decide whether the court abused its discretion in the award of punitive damages. We therefore remand the case to the trial court for a review of the punitive damages awards under state and federal excessiveness standards.

### IV.

In her cross-appeal, Ms. Grabinski argues that the trial court abused its discretion in denying her claim for statutory attorney fees for the sole reason that it believed that the punitive damages awards were "generous." She also challenges the trial court's refusal to enter judgment as of the date of the jury verdicts. In light of our remand on the punitive damages issue, we need not address her arguments and dismiss the cross-appeal as moot .

On remand, Ms. Grabinski can bring to the district court's attention the cases of O'Brien v. B.L.C Ins. Co., 768 S.W.2d 64, 71 (Mo. 1989) (en banc), and Moore v. City of Park Hills, 945 S.W.2d 1, 2-3 (Mo. Ct. App. 1997), which deal with attorney fees, and AT&T v. United Computer Syst., Inc., 98 F.3d 1206, 1211 (9th Cir. 1996), which deals with the entry of judgment after remand.

### V.

Accordingly, we affirm in part and reverse in part the judgment of the trial court. We dismiss the cross-appeal as moot and remand the case for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-13-