BEAM, Circuit Judge,
dissenting.
In an effort to save the district court’s ambiguous oral decision, which holds Director VonWald, a remote jailhouse administrator, individually liable for $214,000 in compensatory damages (without expert causation testimony) and $750,000 in punitive damages, the panel majority engages in fact finding, conjecture, and ultimately places upon prison officials Eighth-Amendment duties not heretofore recognized. Under the panel majority’s newly forged theory of Eighth Amendment liability, a remote prison supervisor with general knowledge of a prisoner’s potential for developing medical complications must engage in an immediate, personal, hands-on and continuing management of the prisoner’s medical care even where the prisoner’s medical care has been entrusted to highly trained medical professionals and the supervisor has no reason to believe such professionals are mistreating (or not treating) the prisoner. Moreover, the panel majority’s affirmance of the district court’s punitive award defies established Eighth Circuit precedent. To impose a punitive award in a § 1983 case, our precedent requires district courts to find (1) callous indifference; and (2) that a punitive award is necessary, in addition to compensatory damages, to further the goals of punishment and deterrence. Although the district court wholly failed to analyze the goals of punishment and deterrence, the panel majority props up the $750,000 punitive award with its own fact finding and analysis. Ultimately, when the unfortunate facts of this case are considered against the long-established and rigorous standards that govern deliberate indifference claims and punitive awards, it is clear that Schaub’s claims against VonWald must fail. I respectfully dissent.
I. BACKGROUND
Schaub’s confinement at the ADC was split into two periods. The first period of confinement began on March 4, 2003, when Schaub, a paraplegic, began serving his 180-day sentence. This period ended on April 29, 2003, when Schaub fractured his leg and was hospitalized. Neither the district court nor the panel majority finds Eighth-Amendment-defined deliberate indifference on the part of VonWald during this time frame.
During this interval, the ADC housed approximately 130 inmates in multiple housing units, including a special management unit and a work release unit. Schaub was initially housed in the work release unit, which permitted him to leave the ADC twelve hours per day to work and to use his home shower and toilet. Because of his work release, ADC policy dictated that Schaub’s own private physicians, not the ADC medical staff, were responsible for his medical care.
Upon his arrival at the ADC, Schaub was provided with an extra mattress to prevent pressure sores. After a week- and-a-half of confinement, Schaub developed a pressure sore on his left heel after *928 putting shoes on his feet, which were edematous because he was unable to sufficiently elevate his legs in bed. On April 7, 2003, Dr. Kathryn Stolp, one of Schaub’s private Mayo Clinic physicians, wrote VonWald a letter stating that while under her medical care Schaub had developed the sore. Dr. Stolp explained that to prevent skin breakdown, decrease edema, and manage Schaub’s spasticity, Schaub required a padded toilet seat, a special shower bench, a mechanism for elevating his legs, and a pressure-relieving mattress on his bed. At the conclusion of her letter, Dr. Stolp stated, “If [these] conditions cannot be met, I guess I would advocate for him to be on home electronic monitoring.” On April 17, Dr. Robin Molella, the Mayo Clinic physician who supervised the ADC’s medical staff, reviewed Dr. Stolp’s recommendations. She noted in Schaub’s medical file that the plan for permitting Schaub to take care of his shower and toilet needs at home was “adequate,” but his bedding situation was “still suboptimal.” Dr. Molella further noted that if Schaub must remain in the ADC “then we will request an evaluation of the environment by [Dr. Stolp] for adaptations.”
On April 29, Schaub fell in his cell and broke his leg. Schaub transported himself to a local hospital where he underwent surgery and was hospitalized for about a week, thus ending the first period of confinement. As noted above, Schaub departed from this fifty-seven-day work-release period with one edema-induced sore on his left heel caused by tight shoes.
Between this first period of confinement and the second period of confinement, which began on July 15, Schaub, after the hospitalization, returned home to recuperate from leg surgery. On May 12, 2003, while at home under the care of his own physicians, Schaub, picking up on Dr. Stolp’s April 7 comment, petitioned state court judge Jodi Williamson (sometimes state or sentencing judge) for a sentence modification that would permit him to carry out the remainder of his sentence on electronic home monitoring. To support the petition, Schaub filed (1) Schaub’s sworn affidavit, dated April 25; (2) Dr. Stolp’s letter, dated April 7; and (3) a hospital summary, dated May 3, which notes that Schaub broke his femur and that he had the one pressure sore on his left heel. Notably, all three documents indicated that Schaub was still in the ADC’s work release program and there was no indication that Schaub was unemployed. Judge Williamson sent VonWald a letter requesting him to review these documents and to comment upon whether the ADC could accommodate Schaub.
On May 15, 2003, VonWald responded to Judge Williamson’s letter, stating “I believe we have addressed all of [Schaub’s] concerns except the bed issue.” Obviously under the impression that Schaub would return to the work release unit and continue under the care of his private physicians, VonWald explained, “[W]e give him sufficient time out of the ADC to take care of any medical and personal hygiene issues that we don’t address in the ADC.” He also stated, “[W]e don’t have a hospital bed that can be electronically adjusted but we felt that by allowing [Schaub to bring in] whatever he thought he needed in mattresses and cushions would fulfill [Dr. Stolp’s] orders.” At the conclusion of the letter, VonWald told Judge Williamson that “[t]he [electronic home monitoring] program is certainly an option. We can put him on GPS, alcohol monitoring, and tighten down his day pretty snug. Additionally, I assume at your request the Probation Department can intensify their home visits and checks.” VonWald did not inform Judge Williamson that he knew a fire code barred pressure-relieving mattresses at the ADC. On May 16, Judge Williamson, without explaining her action *929 in any detail, denied Schaub’s request to modify his sentence. VonWald then directed Captain Stacy Sinner, who was responsible for overseeing the operations staff of the ADC, to ensure that Schaub was accommodated.
I pause for a moment to contemplate the significance of VonWald’s May 15 letter. It is this letter that was the basis for the federal district court’s (district court) heated in-court disapproval of VonWald’s later inaction with regard to Schaub, Trial Tr. vol. IV, 480, 485 (Dec. 17, 2009), a disapproval now joined by the panel majority (sometimes panel or majority) in this appeal, ante at 916. During this judicial exercise of disapproval, the district court made a finding that VonWald’s communication to Judge Williamson contained falsehoods that gave her misleading impressions that presumably led to the denial of Schaub’s petition for electronic home monitoring. And, this denial, in turn, in the eyes of the district court, was largely responsible for Schaub’s physical deterioration when his incarceration continued in mid-July.
Given the circumstances extant at the time of the May 15 communication,[15] it is difficult to detect intentional or reckless falsity on the part of VonWald that could have been the wellspring for constitutionally defined deliberate indifference. And, indeed, except for Judge Williamson’s denial of Schaub’s home monitoring request and the documents attached to the order, there is no evidence in the record revealing Judge Williamson’s state of mind as it might have been affected by VonWald’s letter. Bluntly stated, and as the facts clearly establish, any perceived connection between the VonWald letter and the medical treatment accorded Schaub during his later incarceration is based upon pure speculation on the part of the district court.
As one can best understand the district court’s rationale, it apparently believed that if VonWald had revealed to Judge Williamson that a fire code (not of VonWald’s imposition) barred the ADC’s use of the type of “pressure-relieving mattress” referenced in Dr. Stolp’s April 7 letter, Judge Williamson would have granted Schaub electronic home monitoring. There is, of course, insufficient evidence in the record to make this anything but a guess. And guesses of this kind are clearly not the stuff of deliberate indifference, let alone callous indifference.
But, if guesses are allowed in cases such as this, it is a better guess that Judge Williamson’s denial stemmed from opposition from the state prosecutor and the judge’s reluctance in the face of such opposition (and the facts presented to her at that time) to release from custody an inmate who was required to register as a predatory offender because of his incarceration conviction — felony sexual conduct involving a child of less than thirteen years. Minnesota v. Schaub, No. K4024311/02058875 (Minn.Dist.Ct. Jan. 16, 2003) (sentencing order).
An even better guess emerges from the record before the court. Judge Williamson knew that Schaub had spent fifty-seven twelve-hour days at the ADC reclining on jail-issued bedding and mattresses. During this time he had developed but one sore on the heel which was caused by *930 wearing a shoe (possibly while at work or at home) on his edematous foot. She also knew that the ADC could not supply a hospital bed to raise his feet to relieve the edema but could and would supply or allow Schaub to provide whatever mattresses and cushions he needed. And upon his return on July 15, the ADC medical staff did furnish Schaub (who admitted he never requested a pressure-relieving mattress and who testified he used a regular mattress in his own home) an extra mattress, a sheepskin to reduce pressure and foam wedges for body elevation purposes. The staff was also directed to reposition Schaub hourly. Although the panel makes note of the fact that there is no proof that the repositioning occurred as ordered, there is, likewise, no evidence from Schaub, the bearer of the burden of proof of culpability, that it did not occur.
Thus, it is more likely that Judge Williamson reasonably thought VonWald’s suggested alternatives, including adaptations to Dr. Stolp’s various observations and recommendations, made his prognosis for care of Schaub viable, especially given the contemplated work-release scenario. And the prognosis made under such circumstances was reasonable and viable, even though, as it turned out, Schaub returned to the ADC in July in a considerably worsened physical condition. Indeed, the panel majority admits as much when it concedes that “the (non)provision of a pressure mattress was not the sine qua non of the Eighth Amendment violation found by the district court.” Ante at 917 n. 5.
After seventy-six days away in the hospital and at home recuperating, Schaub commenced his second period of confinement on July 15, a period that lasted parts of ten days. To VonWald’s surprise, Schaub had lost his job and, thus, was no longer eligible for the work release program. Accordingly, Schaub was placed in the special management unit, which was designed to accommodate inmates with physical health needs. Schaub’s move to this unit triggered a shift in his medical treatment; because Schaub was no longer in the work release program, he was not allowed to leave the facility, visit his own medical providers, or use his home shower and toilet. Rather, the ADC medical staff, supervised by Dr. Molella, became responsible for treating Schaub’s medical needs. On July 16, Patricia Crandall, a registered nurse who worked at the ADC most weekdays, met with Schaub and noted in his medical file that he needed a catheter bag, wound dressings, a bed pad, raisers for his feet and head, a toilet raiser, a shower chair, and two mattresses until a “new thicker one” was provided.[16]
Dr. Molella evaluated Schaub on July 17 and noted that Schaub’s skin condition had become “serious.” Indeed, while Schaub left the ADC on April 29 with one pressure sore on his left heel, Dr. Molella’s notes reveal that Schaub returned to the ADC on July 15 with: (1) two (not one) separate ulcers on his left heel; (2) a new 2.5 centimeter ulcer on his right lateral malleolus (ankle bone); (3) a new 2.5 centimeter ulcer on his ischial (lower buttock) region; and (4) a developing 4x5 centimeter area of pressure on his sacral region. Dr. Molella dressed the wounds “as necessary” with DuoDERM bandages. She testified at trial that DuoDERM “acts as a second skin” and is usually not changed on a daily basis. According to Dr. Molella, depending on whether DuoDERM continues to properly adhere and whether it properly covers a wound, DuoDERM “can stay on until, essentially, the wound is healed.”
Dr. Molella also noted on July 17 that Schaub had been provided with two mat *931 tresses and a sheepskin to reduce pressure from his bed, and foam wedges for body elevation purposes. She recognized these adaptations were “improvements” but noted that Schaub was unable to reposition himself in bed due to the absence of grab bars. Dr. Molella also inconclusively determined that she was “not certain [the improvements were] adequate adaptations.” [17] At trial, Dr. Molella explained that she employed a “watchful waiting” approach to determine whether “[Schaub’s] condition was going to get better or get worse.” Pursuant to this approach, Dr. Molella directed her staff (1) to closely monitor Schaub; (2) to assist with bandage changes; and (3) to aid in repositioning Schaub hourly.
Between July 17 and July 23, the treatment notes do not state that the ADC medical staff bathed Schaub or dressed his wounds. Schaub testified that he sent “kites,” or written requests, to the nursing staff on a daily basis, requesting showers and bandage changes, but the staff denied such treatment. This may not have been true because evidence indicated that responses to kites were often made on the kites themselves instead of on the treatment notes. However, two years after Schaub was discharged from the ADC, the kites were discarded in the regular course of the ADC’s document retention program. So, the district court credited Schaub’s testimony. At trial, VonWald described the ADC inmate grievance process as follows:
[Generally speaking, the detainee is dealing with front line deputies, and ... then if he has a request for something that the deputy can’t manage, then it goes up to the sergeant, and if the sergeant feels like it’s a policy issue or something that needs to be addressed at a higher level, [it] would go to the captain, and if the captain is struggling with it also, then it would eventually end up on my desk. Once in a blue moon do I end up with a kite on my desk, but very, very seldom.
VonWald testified that he never received a kite from Schaub, despite the availability of a grievance appeal process.[18] Schaub similarly testified that he did not make any appeals to Captain Sinner or VonWald and conceded that he had no personal contact with either administrator while he was confined at the ADC. Schaub also testified that he never requested to see a doctor or made any requests for special bedding beyond the adaptations provided by the ADC medical staff.
Sometime between July 17 and July 22, Nurse Crandall requested VonWald’s permission for an outside nursing agency to *932 have access to Schaub. VonWald approved that request and, on July 22, a home health care nurse assessed Schaub along with ADC Nurse Anne Polikowsky. The nurses noted an odor emanating from one of Schaub’s sores and provided Schaub an antibiotic with Dr. Molella’s approval. Nurse Polikowsky’s treatment notes do not indicate that Schaub’s dressings were changed that day. She testified that she would have changed Schaub’s DuoDERM dressings if they needed to be changed at that time. Nurse Polikowsky’s notes also indicate that she gave Schaub extra pillows to keep pressure off his coccyx.
On July 23, ADC Nurse Rebecca Nesse examined Schaub after he was bathed. She placed new DuoDERM bandages on his existing pressure sores, noted a large area of new skin breakdown on his sacrum, and scheduled an appointment for Schaub to see Dr. Molella the next morning. Nurse Nesse explained at trial that she did not schedule an immediate appointment because “Mr. Schaub’s life was not at risk. He had a chronic condition that we were doing our best to take care of.”
On the morning of July 24, Dr. Molella examined Schaub and sent him to a private hospital’s emergency room. Dr. Molella’s treatment notes for that day unequivocally state that Schaub’s “health has continued to decline. In his current state we cannot provide the skin cares and other skilled nursing support required to improve and manage his condition.” (emphasis added). She, therefore, recommended that Schaub not be returned to the ADC. This is the first time that Dr. Molella, or any other medical professional, unequivocally noted that the ADC medical staff could not adequately manage Schaub’s needs through adaptive measures. Schaub’s medical condition declined under Dr. Molella’s “watchful waiting” approach, and his condition continued to decline after his release while he was under the care of private physicians. Three days after Schaub was released from the ADC, one of Schaub’s private physicians noted that Schaub’s sacral and ischial sores were at stages 1 (superficial) and 3, respectively. On August 15, the same doctor noted that Schaub’s wounds had “worsened,” and the record reflects that both these sores ultimately progressed to stage 4. Schaub also testified that he developed two additional pressure sores after he was released from the ADC on July 24.
Based on the above evidence, the district court held that VonWald — and VonWald alone — was deliberately indifferent to Schaub’s objectively serious medical needs and held VonWald liable for $214,000 in lost wages and pain and suffering, and $750,000 in punitive damages, for a total of $964,000. To do so, the district court principally relied on VonWald’s May 15 letter to Judge Williamson and the ADC medical staffs failure to bathe Schaub or change his dressings between July 17 and July 23. VonWald appeals, asserting that the record does not support Schaub’s deliberate indifference claim or the $750,000 punitive award.
II. DISCUSSION
A. Deliberate Indifference — Eighth Amendment
Although the panel majority discounts the importance of context with regard to VonWald’s May 15 letter to the sentencing court — that VonWald thought Schaub would remain on work release under the care of his own physicians — it claims for itself a pseudo context of facts and circumstances surrounding Schaub’s return to full-time confinement and ADC-directed medical care upon loss of his employment.[19] But, even applying this pseudo *933 context, I find the panel’s analysis substantially wanting.
The panel loosely weaves, evidence-wise, a tapestry adorned with factually and legally unsupportable breaches of duty and other transgressions by VonWald. Its panorama begins with VonWald becoming aware of Schaub’s full-time return to the ADC on July 15. Although I do not disagree with the panel majority that Schaub had serious medical needs between July 15 and July 24 — needs Dr. Molella documented during her July 17 evaluation — there is little evidence to support the idea that VonWald personally became aware of or had a duty to become aware of such needs. For all VonWald knew, Schaub was returning to the ADC’s work release program on July 15 after seventy-six days of recuperating from a broken leg and one edema-induced pressure sore. Nevertheless, the district court and the panel majority contend that VonWald had a duty, upon Schaub’s return, to assume, as the Director of the ADC, immediate, personal, hands-on and continuing management of Schaub’s medical treatment. For reasons outlined in more detail shortly, there is no precedent that supports the existence of such an Eighth Amendment duty based on the applicable facts and the ADC’s routine course of operation.
Additionally, assuming that VonWald was or should have become aware of Dr. Molella’s July 17 evaluation of Schaub’s condition, which noted his new, outside-acquired wounds and frailties, there is no precedent that required VonWald' — who had no reason to believe the highly trained ADC medical staff would fail or was failing to treat Schaub — to pierce at least two levels of established subordinate supervision, Captain Sinner and Dr. Molella, to personally examine this particular prisoner’s medical records and to then assume supervision management and responsibility for Schaub’s serious medical needs. Even if, in the course of events, VonWald was negligent, or even grossly negligent, in carrying out his duties (which of course he was not) there is no Supreme Court or other federal court precedent that imposes such a constitutional requirement.
To prevail on his Eighth Amendment deliberate indifference claim, Schaub bears the burden of proving that VonWald’s mental state was “akin to criminal recklessness: disregarding a known risk to the inmate’s health.” Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir.2009) (quotation omitted). This rigorous standard is “greater than gross negligence” and VonWald may not be held liable unless he (1) recognized the existence of a substantial *934 risk of harm to Schaub’s health; and (2) knew that his conduct was “inappropriate in light of that risk.” Krout v. Goemmer, 583 F.3d 557, 567 (8th Cir.2009). But, supervisors such as VonWald cannot be held liable for an employee’s unconstitutional actions under § 1983 on a theory of respondeat superior. Boyd v. Knox, 47 F.3d 966, 968 (8th Cir.1995). “Rather, a supervisor incurs liability for an Eighth Amendment violation when the supervisor is personally involved in the violation or when the supervisor’s corrective inaction constitutes deliberate indifference toward the violation.” Id. Each step of the deliberate indifference inquiry is fact-intensive, and we review the district court’s factual conclusions for clear error. Hartsfield v. Colburn, 491 F.3d 394, 397 (8th Cir.2007). Under clear error review, we may reverse the district court if its decision is not supported by substantial evidence, was based on an erroneous view of the law, or we are left with a firm conviction that a mistake has been made after reviewing the entire record. United States v. Fazio, 487 F.3d 646, 657 (8th Cir.2007).
After reviewing the entire record, there is clearly a dearth of evidence regarding what VonWald knew, or was directly responsible for knowing, about Schaub’s medical needs during the period at issue— July 17 through July 24. As earlier noted, Schaub conceded at trial that he never (1) made any appeals to VonWald; (2) had any personal contact with VonWald during his confinement at the ADC; (3) requested special bedding accommodations beyond those provided by the ADC medical staff; or (4) requested to see a doctor between July 17 and July 24. Moreover, the evidence presented at trial shows that the ADC medical staff contacted VonWald just one time regarding Schaub’s medical treatment between July 17 and July 24. On that occasion, VonWald approved Nurse Crandall’s request for an outside agency to have access to Schaub. Simply put, between July 17 and July 24, there is no evidence that anyone notified VonWald that Schaub’s bedding and wound-care needs were not being met — not Dr. Molella, not the ADC medical staff, not the ADC deputies, and not even Schaub. Absent such notice, there is certainly no basis for requiring the ADC director to essentially become a working member of the jail’s medical unit.
Despite the lack of evidence regarding VonWald’s knowledge of Schaub’s medical needs between July 17 and July 24, the panel majority charges VonWald with notice of such needs because (1) VonWald reviewed Dr. Stolp’s April 7 letter; and (2) VonWald failed to make any inquires into Schaub’s medical treatment between July 17 and July 24. Under established precedent, these facts are grossly insufficient to bridge the gap between the lack of evidence regarding VonWald’s knowledge and the rigorous “greater than gross negligence” standard.
It is not clear how Dr. Stolp’s April 7 letter, written at a time when Schaub had one pressure sore, gave VonWald notice that Schaub would return to the ADC on July 15 with four pressure sores and a developing area of pressure on his sacral region. Similarly, it is not clear how Dr. Stolp’s letter, written at a time when Schaub did not have access to the ADC medical staff and had not yet been provided with adaptive bedding accommodations, gave VonWald notice that the ADC medical staff could not meet Schaub’s needs. Indeed, it was not until July 24 that Dr. Molella even became certain that the ADC medical staff could not meet Schaub’s needs through adaptive measures and, at that point, she took the steps necessary to ensure that Schaub received treatment elsewhere. If it was not until July 24 that Dr. Molella, a Mayo Clinic physician, became certain that the ADC medical staff *935 could not meet Schaub’s needs through adaptive measures, it is not clear how VonWald, a non-medical prison official who had no contact with Schaub, could or should have known such information before that time. “Th[e] [scienter] element of deliberate indifference must be viewed from [VonWald’s] perspective at the time in question, not with hindsight’s perfect vision.” Jackson v. Everett, 140 F.3d 1149, 1152 (8th Cir.1998) (emphasis added).
Also, in assuming that Dr. Stolp’s April 7 letter sets forth the “required” course of treatment for Schaub between July 17 and July 24, the district court and the panel majority, without supporting medical evidence, improperly assume that the ADC medical staffs plan to meet Schaub’s needs through adaptive measures was inappropriate under the circumstances. Ante at 915-16. While providing Schaub a pressure-relieving mattress may have represented the optimal course of treatment,[20] inmates are only entitled to “adequate medical care,” not the best care possible. Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir.2006) (quotation omitted). Indeed, the Eighth Amendment does not require prisoners to receive “unqualified access to health care,” Hudson v. McMillian, 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), and “prison doctors remain free to exercise their independent medical judgment.” Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997). While Dr. Stolp advocated a pressure-relieving mattress on April 7, Dr. Molella was not certain as of July 17 that a pressure-relieving mattress was the only way to adequately meet Schaub’s medical needs.[21] This is significant because prison officials “may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.... [And,] a showing of deliberate indifference ... requires more than mere disagreement with treatment decisions.” Krout, 583 F.3d at 567 (quotations omitted). Under these circumstances, VonWald reasonably relied on the ADC’s professional medical staff to accommodate Schaub.
In an unconvincing attempt to impute the ADC medical staffs duties and knowledge of Schaub’s condition between July 17 and July 24 to VonWald, the panel majority asserts that “any inquiry into Schaub’s treatment (or an examination of his medical file) would have revealed that his treatment was entirely insufficient.” Ante at 918. This argument ignores the fact that, as discussed above, Schaub never made any appeals to VonWald and the ADC medical staff never told VonWald that Schaub’s care, despite the implementation of an adaptive plan, was inadequate. The panel majority’s notion that — absent a reason to believe (or actual knowledge) that the ADC medical staff was mistreating Schaub — VonWald had a legal duty to personally supervise Schaub’s treatment between July 17 and July 24 ignores the division of labor present within correctional facilities.
If a prisoner is under the care of medical experts ([Dr. Molella] in this case), a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is pro *936 moted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician’s care would strain this division of labor____ [A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official like [VonWald] will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference.
Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir.2004); see also Johnson, 433 F.3d at 1010 n. 9. Surely, it was reasonable for VonWald, a non-medical prison official, to rely on a Mayo Clinic physician and the nurses she supervised to (1) meet Schaub’s needs, and (2) notify him if such needs were not being' met through adaptive measures between July 17 and July 24.
The panel majority cites Langford v. Norris, 614 F.3d 445 (8th Cir.2010), to support its contention that VonWald had a duty to personally follow up with the ADC medical staff to determine whether Schaub’s needs were in fact being met. But, Langford imposes no such duty under the facts of this case. Langford simply explains that “if [a supervisor] knew that [an inmate’s] serious medical needs were not being adequately treated yet remained indifferent, he may be held personally liable.” Id. at 460-61 (emphasis added). Here, unlike the supervisor in Langford, VonWald did not receive notice from Schaub (or anyone else) that the ADC medical staff was failing to meet Schaub’s needs between July 17 and July 24. Cf. id. at 460-62 (holding that a supervisor who received inmates’ “complaints about receiving deficient medical care” could be liable for his failure to ensure that the inmates received adequate treatment).
Similarly, under the circumstances presented in this case, VonWald may not be held liable under a “failure to supervise” theory of liability. In Parrish v. Ball, 594 F.3d 993, 1002 (8th Cir.2010), we explained that to succeed on a “failure to supervise” theory under § 1983, the plaintiff must show that the supervisor: “(1) [rjeceived notice of a pattern of unconstitutional acts committed by subordinates; (2) [demonstrated deliberate indifference to or tacit authorization of the offensive acts; (3) [flailed to take sufficient remedial action; and (4) [t]hat such failure proximately caused injury to [the plaintiff].” (emphasis added) (quotation omitted). Needless to say, there is no evidence that VonWald had any reason to believe the nursing staff would fail to bathe Schaub, change his dressings, or reposition him in bed. The panel majority recognizes that such treatment was “well within the ken of the nursing staff,” ante at 919, yet the majority faults VonWald for assuming, without follow-up, that the nursing staff would provide such care. In doing so, the panel ignores the fact that VonWald was entitled to rely on the ADC medical staffs professional training and ethical obligations to treat Schaub. Spruill, 372 F.3d at 236; cf. Connick v. Thompson, — U.S. -, 131 S.Ct. 1350, 1363, 179 L.Ed.2d 417 (2011) (holding in the official liability context that a district attorney had no duty to train his prosecutors regarding the constitutional obligation at issue because “[a] district attorney is entitled to rely on prosecutors’ professional training and ethical obligations in the absence of specific reason, such as a pattern of violations, to believe that those tools are insufficient to prevent future constitutional violations”). To be sure, VonWald knew that the nursing staff could not provide Schaub with a pressure-relieving mattress but the panel majority concedes “the (non)provision of a pressure mattress was not the sine qua non of the *937 Eighth Amendment violation found by the district court.” Ante at 917 n. 5.
The panel’s requirements do not end there. Because, according to the majority, VonWald was untruthful with the sentencing judge about the quantity and quality of the ADC’s medical capabilities and because he had the duty as director to become immediately aware of Schaub’s serious medical needs, VonWald, not Schaub or his lawyer, had a duty to intercede sua sponte with Judge Williamson in support of Schaub being immediately placed on electronic-monitored home detention. Breach of the above-outlined duties, says the district court and the panel, constituted reckless indifference in violation of the Eighth Amendment. I very respectfully believe that this constitutes imagination unchecked. See, e.g., Michigan v. Bryant, — U.S. -, 131 S.Ct. 1143, 1172, 179 L.Ed.2d 93 (2011) (Scalia, J., dissenting).
I also disagree with the panel majority’s conclusion that expert causation testimony was not required in this case because “VonWald’s deliberate indifference clearly exacerbated Schaub’s wounds.” Ante at 921. “When an injury is sophisticated, proof of causation generally must be established by expert testimony.” Robinson v. Hager, 292 F.3d 560, 564 (8th Cir.2002). Here, Schaub’s failure to present any expert causation testimony is fatal to his claim because he clearly suffered from a sophisticated medical condition. Indeed, Dr. Molella testified at trial, without refutation by Schaub, that Schaub had “very complicated health needs.” Although the panel majority attempts to simplify Schaub’s condition, causation in this case was simply not within the realm of lay understanding. Id.
The total absence of any medical expert causation evidence makes it impossible to determine the extent of VonWald’s damages liability, if any, for acts occurring between July 17 and July 24. And, the district court and the majority find no reckless indifference at any other time period. To be sure, the “eggshell skull” rule — i.e., a tortfeasor takes his victim as he finds him — applies to a § 1983 case. Gibson v. County of Washoe, 290 F.3d 1175, 1193 (9th Cir.2002). However, the rule must not be applied in a way that obliterates the requirement that “[a] defendant may be held liable only for the damages that [he] actually causes.” Limone v. United States, 579 F.3d 79, 108 (1st Cir.2009). Indeed, notwithstanding the eggshell skull rule, a “defendant ... is liable only for the extent to which the defendant’s conduct has resulted in an aggravation of the pre-existing condition, and not for the condition as it was.” Gibson, 290 F.3d at 1193 (emphasis added) (quotation omitted).
A review of the district court’s factual findings, the parties’ stipulation of fact and other unrebutted portions of the record, highlights the evidentiary problems concerning causation. Without dispute, the first period of incarceration ended on April 29 when a fall at the ADC fractured Schaub’s femur, resulting in a week’s hospitalization. At that time, Schaub had one pressure sore on his left heel. The district court concluded that a deep thigh bruise resulted from Schaub’s fall on April 29 and the bruise later developed “into an open pressure sore” on his ischial (lower buttock) region. Dr. Molella’s July 17 evaluation indicated that Schaub returned to the ADC on July 15 with: (1) the previously undocumented 2.5 centimeter sore on his ischial region; (2) two (not one) separate ulcers on his left heel; (3) a new 2.5 centimeter sore on his right ankle bone; and (4) a new 4x5 centimeter area of pressure on his sacral region, which was appraised by Schaub’s private physician on July 27 (three days after his discharge) as stage 1 (superficial). Moreover, at least two additional pressure sores developed after Schaub’s final departure from the *938 ADC. Against this evidentiary background, the district court and the panel majority assess damages against VonWald on the basis of Schaub’s physical condition as it existed up to four years after he finally departed the ADC. This levy of damages includes the results of major surgery involving his fractured femur and the ischial region sore that developed from the thigh bruise that occurred at the time of the fracture. The district court specifically made no apportionment of physical damage that existed prior to July 17 or which was directly connected with the femur fracture of April 29 or incidents or medical care that occurred after July 24.
The only causation testimony in any way related to the four-year period was Schaub’s testimony concerning his health prior to incarceration and his view of the fateful eight-day period in July 2003.[22] Otherwise, the majority relies upon records kept by the ADC medical staff and testimony from Dr. Molella and three nurses that prove, it claims, that Schaub’s “wounds” were “exacerbated” between July. 17 through July 24. Exacerbated perhaps, but the record simply does not support the conclusion that this eight days of care was a sole proximate cause of every facet of damages Schaub allegedly incurred during the longer than four-year period at issue. VonWald had no responsibility for Schaub’s femur fracture, or the heel sore that initiated during his original fifty-seven day stay.[23] Nor does the evidence support a finding that VonWald was responsible for the additional pressure sores Schaub brought along on July 15, or the surgery that developed from the leg fracture or the care that occurred while the two sores developed after July 24.[24]
*939 The panel majority cites Parrish, 594 F.3d 993, and Ricketts v. City of Columbia, 36 F.3d 775 (8th Cir.1994), as precedent for its unsupported conclusion that VonWald’s deliberate indifference clearly caused Schaub’s damages. Neither case supports the panel majority’s position that specific causation evidence is not necessary in a case such as this. Indeed, both Parrish and Ricketts say only that if in a particular case relevant evidence of causation makes the issue “free from doubt,” the court may find causation as a matter of law, nothing more. Parrish, 594 F.3d at 1000 (quotation omitted); Ricketts, 36 F.3d at 779-80 (quotation omitted). Certainly, a finding of deliberate indifference does not come with self-executing proof of causation attached.
With the naked statement that the care Schaub received from July 17 through July 24, “exacerbated Schaub’s wounds,” ante at 921, the panel affirms the global damages imposed by the district court based upon an undifferentiated evaluation of Schaub’s entire health travails extending from March 4, 2003, until at least four years later. Ante at 921. Without expert testimony, there is simply failure of proof. See Gibson v. Weber, 433 F.3d 642, 646 (8th Cir.2006) (holding that expert causation testimony was required to show that allegedly deficient treatment plan caused claimant’s foot infection and subsequent amputation where the claimant’s medical condition predisposed him to injuries of this nature and the foot wound worsened under claimant’s own care).
B. Punitive Damages
Even if VonWald is somehow liable to Schaub for $214,000 in compensatory damages, the record simply does not support the district court’s $750,000 punitive award. Punitive damages are appropriate in a § 1983 action only where a defendant shows “reckless or callous indifference” to a federally protected right. Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). If the district court finds that the defendant’s conduct meets the callousness threshold, “the court should then consider the two purposes of punitive damages: (1) punish willful or malicious conduct; and (2) deter future unlawful conduct.” Royal v. Kautzky, 375 F.3d 720, 724 (8th Cir.2004). In other words, to award punitive damages in this case, “the district court was required to find not only that [VonWald’s] conduct met the callousness threshold ... but also that [his] conduct merited a punitive award ... in addition to the compensatory award.” Coleman v. Rahija, 114 F.3d 778, 787 (8th Cir.1997) (emphasis added). Whether a defendant’s conduct meets the callousness threshold is a question of fact, which we review for clear error, but the question of whether conduct merits a punitive award in addition to a compensatory award is a “moral judgment,” which we review for an abuse of discretion. Id.; Royal, 375 F.3d at 724.
Although the “deliberate indifference” and “callous indifference” standards are similar, “[a] finding of deliberate indifference to a serious medical need ... does not necessitate a finding of callous indifference warranting punitive damages.” Coleman, 114 F.3d at 787. VonWald’s conduct in this case was clearly not sufficiently egregious to justify the imposition of punitive damages. As discussed above, there is a dearth of evidence regarding what VonWald knew about Schaub’s medical needs between July 17 and July 24, but there is evidence that VonWald relied on Dr. Molella and the ADC medical staff to treat Schaub through adaptive techniques. See id. at 788 (holding that a registered nurse was not liable for punitive damages because she relied on, and attempted to follow, a physician’s instructions). Moreover, there is no evidence that VonWald acted with bad faith, evil motive, or ill *940 intent, and the district court expressly conceded as much. See id. at 787-88. In fact, VonWald had no personal contact with Schaub during Schaub’s confinement at the ADC, and he approved what appears to be the only request brought to him by the ADC medical staff between July 15 and July 24 — Nurse Crandall’s request for home health care nurses to have access to Schaub.
To affirm the district court’s conclusion that VonWald’s conduct meets the callousness threshold, the panel majority emphasizes that VonWald assured Judge Williamson that Schaub could bring in whatever mattresses he thought he needed, even though VonWald knew a fire code barred pressure-relieving mattresses in the ADC. The panel majority’s reliance on this exchange between Judge Williamson and VonWald is extremely problematic because, as discussed above, it took place long before VonWald could have known that Schaub would return to the ADC with four pressure sores instead of one, and before VonWald could have known that Schaub would lose his work release privileges and be under the care of the ADC medical staff. Aso, it is significant that the ADC medical staff later provided Schaub with adaptive bedding accommodations, even if in hindsight such accommodations proved to be insufficient. Schaub conceded at trial that he never requested special bedding accommodations beyond those provided by the ADC medical staff between July 15 and July 24. Simply put, the heavy emphasis the panel majority places on VonWald’s letter to Judge Williamson stretches the letter far beyond its contextual limits.
Even assuming VonWald’s conduct meets the callousness threshold, I would find that the district court abused its discretion in awarding Schaub $750,000 in punitive damages because the district court, contrary to Eighth Circuit precedent, wholly failed to consider whether the award advances the two underlying purposes of punitive damages: (1) to punish willful or malicious conduct; and (2) to deter further conduct. In § 1983 cases, punitive damages are the exception, not the rule, because “[§] 1983 presupposes that damages that compensate for actual harm ordinarily suffice to deter constitutional violations.” Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 310, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) (emphasis added). Here, the district court levied the punitive award against VonWald, in addition to a $214,000 compensatory award, without making any findings regarding the need for additional deterrence or punishment. See Coleman, 114 F.3d at 787 (requiring district courts to conduct such an analysis). To be sure, the district court made findings of fact in an attempt to support its conclusion that VonWald’s conduct met the callousness threshold, but the district court did not so much as mention “deterrence” or “punishment” in its oral decision or otherwise acknowledge its duty to consider such factors before imposing punitive damages. Cf. Royal, 375 F.3d at 725 (finding no abuse of discretion where the court accurately stated the standard governing punitive awards and made a determination regarding the need for deterrence and punishment).
The district court’s error is significant because there is at least some evidence in the record to suggest that a $750,000 punitive award, in addition to the sizeable $214,000 compensatory award, was not necessary to further the goals of punishment or deterrence in this case. For example, the need for deterrence is arguably lessened by the fact that VonWald was no longer a jail administrator; he was appointed sheriff of Olmsted County approximately two years before trial. The majority’s footnote 12, which duly notes that punitive awards may be used to deter *941 others, misses the point.[25] Ante at 923 n. 12. The district court’s failure to discuss either deterrence or punishment in its oral decision leaves us guessing as to why or if the district court even decided that a punitive award was necessary in addition to $214,000 in compensatory damages to achieve the goals of deterrence and punishment. Rather than vacating the award and remanding for findings of fact, the majority attempts to support the district court’s punitive award by making its own findings of fact and conducting its own analysis regarding the need for additional deterrence and punishment. This, as an appellate court, we cannot do. See Duffie v. Deere & Co., 111 F.3d 70, 74 (8th Cir.1997).
It is also troubling that there is no evidence in the record regarding VonWald’s ability to pay the $750,000 punitive award. As the court in Hollins v. Powell, 773 F.2d 191 (8th Cir.1985) explained while reviewing a punitive award in a § 1983 case: “We can see neither the justice nor sense in affirming a verdict which cannot possibly be satisfied. The purpose of punitive damages is to punish [the wrongdoer] for outrageous conduct, not to drain him of his life’s blood.” Id. at 198; see also City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 269, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981) (acknowledging that punitive damages may be awarded “in appropriate circumstances against the offending official, based on his personal financial resources”); Eighth Circuit Model Jury Instruction 4.50C (instructing that, in a civil rights case, the jury should consider the defendant’s financial condition to determine what amount of punitive damages is needed to punish the defendant and deter him and others in the future). “The principle that a punitive award must be considered in light of the defendant’s financial condition is aneient[,]” dating back to the Magna Carta nearly 800 years ago. Adams v. Murakami, 54 Cal.3d 105, 284 Cal.Rptr. 318, 813 P.2d 1348, 1352-53 (1991). It is not surprising, then, that our court applied Hollins in Bredberg v. Long, 778 F.2d 1285, 1290 (8th Cir.1985) to set aside a punitive award where no evidence was presented regarding the financial status of individual defendants. This case demands the same result, and I would set aside the $750,000 punitive award because there is no evidence regarding VonWald’s financial status.
The panel majority emphasizes that in Grabinski v. Blue Springs Ford Sales, Inc., 136 F.3d 565, 570-71 (8th Cir.1998), a panel of this court held that the burden is on defendants to show that their financial circumstances warrant a limitation of punitive awards, and their failure to produce such evidence constitutes waiver. To the extent that Grabinski applies in this context — i.e., to the award of punitive damages in a § 1983 case following a bench trial — I think Grabinski is at odds with Hollins and Bredberg. “When we are confronted with conflicting circuit precedent, the better practice normally is to follow the earliest opinion, as it should have controlled the subsequent panels that created the conflict.” T.L. ex rel. Ingram v. United States, 443 F.3d 956, 960 (8th Cir.2006). I would apply Hollins and *942 Bredberg in this case because they were decided well before Grabinski and because they represent the better approach, especially in the § 1983 context. As discussed above, § 1983 presupposes that compensatory damages act as a sufficient deterrent of constitutional violations. It seems only logical, then, that it is the plaintiffs burden to rebut this presumption by producing evidence, including evidence regarding the defendant’s financial means, that an additional punitive award is necessary to deter or punish the defendant or others. Without any evidence regarding the financial status of VonWald, or any findings of fact regarding the need for further deterrence or punishment, it is simply impossible to determine whether the $750,000 punitive award operates as an effective deterrent or effectively drains VonWald of his life’s blood. I can see “no reason why a modern-day civil defendant should be entitled to less consideration than one was given 800 years ago.” Murakami, 284 Cal.Rptr. 318, 813 P.2d at 1353.[26]
III. CONCLUSION
It is unfortunate that Schaub, a paraplegic, arrived at the ADC with several difficult and precarious physical conditions, in-eluding a predisposition to pressure sores, as outlined by Dr. Stolp in her April 7 letter. It is unfortunate that Schaub fell and fractured his femur and bruised his ischial area, later resulting in major surgery and permanent disability. It is unfortunate that the medical treatment he received during his various hospital visits and at his home under the supervision of his own physicians did not succeed in treating his complex medical problems. But none of these things resulted from constitutionally sufficient breaches of duty by Director VonWald.
The district court seems to have found that Judge Williamson largely denied Schaub electronically monitored home detention at the May modification proceeding because VonWald failed to inform Judge Williamson that pressure-relieving mattresses were barred at the ADC. Even with the attachment of Dr. Stolp’s letter and VonWald’s communication to the denial order, there is almost no evidence that the sentencing judge’s order was substantially based upon this omission or any other falsehood uttered by VonWald. Thus, the district court’s factual finding fails as a matter of law. The panel majority admits such a result when it concedes that the *943 failure to provide a pressure-relieving mattress “was not the sine qua non of the Eighth Amendment violation.” Ante at 917 n. 5.
To buttress its affirmance of the district court’s $964,000 in money judgments, the majority embellishes and defines the extant circumstances and imposes newly minted, but unsupportable, duties upon VonWald, the breach of which, it claims, support a finding of reckless indifference to Schaub’s serious medical needs. These duties evolve as follows:
VonWald was cognizant of the circumstances of the May sentence-modification hearing and of his failure to properly apprise Judge Williamson concerning pressure-relieving mattresses. With this knowledge and the further knowledge that Schaub had returned to full custody on July 15, VonWald had a duty to immediately examine Schaub’s ADC medical records. And, if done, the records would have revealed Dr. Molella’s examination of July 17, which, in turn, would have revealed that Schaub had serious medical needs which presented a congruent need for immediate and proper treatment. With this knowledge, VonWald then had a duty to personally ensure that the highly trained ADC medical staff provided Schaub with routine medical care — baths, dressing changes, and body repositioning.
Even if VonWald had carried out these newly crafted duties, however, there is no evidence that Schaub’s claimed damages would have been averted.
The panel majority essentially concedes that VonWald did not actually know of Schaub’s serious medical needs as they existed between July 17 and 24. And there is no dispute that Schaub’s medical records during that period, if examined, would have revealed such needs. But, the records would also have revealed Dr. Molella’s “watchful waiting” treatment plan, which employed special bedding and other accommodations recommended by the ADC medical unit. They would have also revealed that Dr. Molella expressed no urgency or inclination to immediately remove Schaub to a hospital setting or to his home when she first evaluated him on July 17 or, indeed, until July 24. Should VonWald have seen fit to overrule and disregard this Mayo-Clinic-trained physician’s “watchful waiting” decision, and on his own motion intercede for Schaub with the sentencing court in favor of a home-detention-sentence modification as suggested by the panel, it is doubtful that a sentence modification would have been issued before July 24. Indeed, VonWald would have surely been obligated to give notice to the state prosecutor, especially since the prosecutor had earlier opposed home detention. The prosecutor, in turn, would have likely been entitled to time to investigate the basis for VonWald’s motion and to respond to the court within a reasonable time. Under these circumstances, it is more likely than not that such a sentence modification procedure would have been pretermitted by Dr. Molella’s decision to hospitalize Schaub on July 24.[27]
Thus, the panel majority finds $964,000 in money judgments levied against VonWald based on actions and events over which he had no reasonable control, even if he followed the panel majority’s unprecedented requirements to the letter.
From this result, I dissent.

. VonWald had no way of knowing Schaub would return to the ADC two months later without work release privileges (the ability to visit his private physicians and to use his home shower and toilet) and with four pressure sores instead of one. And, since it was not contemplated that the ADC medical staff would assume responsibility for Schaub's medical care, VonWald's letter makes no assurances regarding the ADC medical staff's ability to accommodate Schaub.

. Nurse Crandall testified that, at that time, the ADC had started purchasing thicker mattresses and she was trying to locate one for Schaub.

. The panel majority emphasizes that Dr. Molella testified that she had no notice that Schaub would be returning to the ADC on July 15 and conceded that she told VonWald in April that she believed "electronic home monitoring would be a simpler choice.” Of course, Judge Williamson’s May 16 denial order directly responded to the electronic monitoring option and, under the Eighth Amendment, inmates are entitled to adequate medical care, not the "simpler choice” in sentencing alternatives. Johnson v. Doughty, 433 F.3d 1001, 1013 (7th Cir.2006). Moreover, immediately after the "simpler choice” testimony, Dr. Molella clarified, "I don’t recall a conversation with director VonWald directly. What I recall is ... that I spoke with one of the sergeants.”

. The majority claims that Schaub was not aware of the grievance appeal process. However, the evidence does not support this attempt to avoid personal culpability since the "kite” system is an integral part of the grievance appeal structure. But, even assuming Schaub was not aware of the appeal process, the relevant point is that, absent an appeal or notice through any other means, VonWald did not know about the denial of Schaub’s requests for treatment between July 17 and July 23.

. The district court and the panel majority advance a confusing context, the elements of which neither factually nor substantively sup *933 port the conclusion that VonWald recklessly disregarded Schaub's serious medical needs in violation of the Eighth Amendment. While the district court, in violation of well-established supervisory and respondeat superior precedent found reckless indifference extending from "July 17 until [Schaub’s] release [from jail on July 24],” Trial Tr. vol. IV, 485 (Dec. 17, 2009), the district court also affirmatively found that the ADC habitation and care prior to the leg fracture on April 29 was not constitutionally deficient. Id. While Dr. Stolp outlined in her April 7 letter Schaub’s somewhat precarious general health as a result of his long-standing paraplegia, neither Dr. Stolp nor any other witness identified any constitutionally defined "serious medical need” that Schaub presented to the ADC until Dr. Molella’s evaluation on July 17. Thus, any attempt to morph VonWald’s May 15 communication with the state sentencing judge — stating that the ADC could, as of that time, provide Schaub adequate medical care and habitation — into a July 17 duty to examine Schaub’s medical records and to intercede with the sentencing judge, encounters a chasm of irrelevancy and immateriality. Indeed, the use of this judicially requested response (anchored as it was to an initial 57-day period of wholly constitutional habitation and care) as a building block that supports a finding of unconstitutional, scienter-laden acts by VonWald defies closely reasoned analysis.

. Schaub testified at trial that, before he was confined at the ADC, his home bed had "a regular mattress on it.” Thus, even if Schaub had carried out the remainder of his sentence on electronic home monitoring, there is no indication that he would have slept on a pressure-relieving mattress.

. Notably, Nurse Crandall, who provided Schaub with two mattresses, foam wedges and a sheepskin, opined at trial that she "provide[d] [Schaub] with what he needed" between July 17 and July 24.

. The majority, in its footnotes 9 and 10, with little, if any, support from facts or foundation in the record, seeks to buttress its faulty causation conclusions by attempting to qualify plaintiff Schaub as his own medical causation expert. This occurs when the panel credits Schaub’s opinion that "the [ischial] infection had gotten so bad that it literally had eaten the whole femur head up.” Trial Tr. vol. Ill, 133 (Dec. 16, 2009). The majority further compounds its evidentiary shortcomings as it endeavors to disassociate the femur fracture from the assessed damages. The record does not permit it to do so. Schaub himself testified that the sore on his right ischial region that ultimately damaged the femur head had its genesis in a bruise that occurred during the femur fall. Id. at 173. The sore actually developed while Schaub was absent from the ADC as was first noted by Dr. Molella on July 17 after Schaub’s July 15 return. The record then establishes that this sore markedly deteriorated after Schaub’s July 24 discharge from the ADC, ultimately developing into an infection damaging the femur head, which infection began nearly five years after Schaub's ADC discharge. Id. at 131-32. A substantial amount of the pain and suffering evidence adduced through Schaub’s testimony involved the femur head infection and its treatment, id. at 129-33, and, there is no indication that the district court did not take such evidence into account in its damages award. But, the causal relationship between his July treatment at the ADC and his later medical problems, especially the femur head problem, is unknowable without expert medical testimony.

. There is at least some indication that before April 29, Schaub may have exacerbated the pressure sore on his heel by failing to get additional bandages from his private physician to dress the wound. Dr. Stolp's April 7 letter states that she gave Schaub "some tape and Cutinova foam” to dress the sore, and Schaub testified at trial that he changed the bandages on the sore at home while he was on work release. However, Schaub’s medical records state that when Schaub was admitted to the hospital on April 29, the sore on Schaub’s heel "[wa]s not healing,” due, in part, "to no available dressings.” The record states that “[Schaub] was restarted on Cutinova foam” to treat the sore.

. Dr. Molella testified that Schaub's deterioration at the ADC between July 17 and July 24 was not “marked deterioration.” She verified, however, that Schaub suffered from "marked deterioration” after he left the ADC on July 24.

. While imagining how the district court could have analyzed the goals of deterrence and punishment in this case, the panel hypothesizes that "[o]ther prison administrators should be deterred from making a false response to a direct judicial inquiry.” Ante at 923 n. 12. Of course, it would be proper for the district court to consider this factor on remand while conducting its own deterrence/punishment analysis. And, while conducting such analysis, it would also be proper for the court to consider other deterrents already in place that may dissuade other administrators from making false responses to state court judges, such as the possibility of facing perjury charges.

. Although not raised by VonWald, I think the 3.5-to-l punitive-to-compensatory damages ratio in this case approaches the outer limits of the due process guarantee. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 418, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (articulating "guideposts” for reviewing the constitutionality of punitive awards). “[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant’s conduct.” Id. at 419, 123 S.Ct. 1513 (alteration in original) (quotation omitted). Here, the degree of reprehensibility is low because, as discussed above, VonWald reasonably relied on the ADC medical staff to treat Schaub. And, while a punitive-to-compensatoiy damages ratio of 4-to-l has been upheld by the Supreme Court in the past, the Court has cautioned that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee.” Id. at 425, 123 S.Ct. 1513. Finally, the district court did not consider the purposes underlying punitive damages before it issued the $750,000 punitive award in this case. Id. at 419, 123 S.Ct. 1513 ("[PJunitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.”). Under these circumstances, it appears that the punitive award in this case was impermissibly based on the district court's caprice, not the application of law. See id. at 418, 123 S.Ct. 1513.

. Indeed, even after Dr. Molella unequivocally noted that the ADC could not accommodate Schaub on July 24, Schaub’s jail sentence was not vacated until July 28, some four days later.